Walsh *v.* John Hancock Mutual Life Insurance Company, Appellant.

Argued September 28, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*William H. Peace, 2nd,* with him *Thomas Raeburn White, Jr., Ira Jewell Williams* and *White, Williams & Scott,* for appellant.

*Albert L. Bricklin,* with him *Bennett & Bricklin,* for appellee.

OPINION BY RENO, J., January 14, 1949:

Plaintiff is the beneficiary in an insurance policy upon the life of her husband issued by the defendant which defended upon the ground of false and fraudulent representations material to the risk contained in the application for the insurance attached to the policy. The jury found for plaintiff for the amount of the policy, and judgment was entered upon the verdict. The case is here on defendant's appeal from the refusal of its motion for judgment n. o. v.

The application was signed on December 29, 1944, and the policy was dated January 5, 1945. By the terms of the policy statements made by the insured are, in the absence of fraud, representations and not warranties. By the terms of both policy and application, only the president and certain designated high executive officers are authorized to waive, or modify conditions of the policy or to bind defendant "by making any statement or receiving at any time any notice or information not contained in the application for this policy." The application recites: ". . . notice to or knowledge of any agent

or medical examiner or any other person whenever given or acquired is not notice to or knowledge of the Company."

Appended to the application is a certificate signed by the insured: "I certify that I am the person named as the proposed insured, and that the foregoing statements and answers which are made in Part B [statements made to medical examiner] of this application, *each of which I have made and read*, and which with Part A [statements made to soliciting agent] of the application shall form the basis of the contract of insurance, *are complete, true and correctly recorded*." (Emphasis added.)

In his application he answered questions Nos. 15, 17 and 18 affirmatively.[1] To an unnumbered request: "If the answer to any or all of Questions 15, 16, 17, and 18, is 'Yes', specify every illness, injury, deformity or operation, with dates, duration, severity, results, the names and addresses of any physicians or other practitioners, and hospitals, etc.," the insured stated: "appendectomy December 1943, Chester Hospital 10 days. fully recovered."

Twenty-two days before he signed the application he had been hospitalized for an ailment which, according to the hospital record, was diagnosed as "angina pectoris, arteriosclerosis cardiac vascular disease." This event he did not report.

---

[1] 15. Have you ever had, or consulted or been treated by a physician or other practitioner for any of the following? [Here follow a number of named diseases of which only three are here material] dizziness, heart disease, . . . appendicitis, . . . or any other illness, injury, deformity, physical defect, impairment or infirmity, or any surgical operation. A. Yes.

17. Have you consulted or been treated by a physician or other practitioner during the past five years? A. Yes.

18. Have you ever received, or applied for treatment at, or attended, any hospital, dispensary, sanitarium, cure, or other institution? A. Yes.

The record of the Delaware County Hospital, admitted without objection, relating to the admission on December 7, 1944, is as follows: "H. P. I.[2] Patient was at work on morning of admission when he complained of sharp, aching pain in both upper arms reaching to elbow, worse on left. Patient started to perspire freely, went to outside office, blacked out and fainted. Patient was carried inside office where he was revived. Patient then complained of weakness and aching pain in arms as before. Patient was taken home where he had nausea, vomiting, and B. M. Patient called M. D. who was not available, then called Upper Darby Police who brought him to hospital in ambulance. In accident room patient was nervous. Blood pressure was 120 over 80, pulse slow. He was admitted for E. K. G.—electrocardiogram—and neurological study. P. H. Appendectomy, December 4, 1943. Patient has complained of intermittent shoulder and upper arm pain for past ten years, aggravated by lifting or carrying objects. Patient has been treated by osteopathic physician without improvement." Across the top of the third page is the final diagnosis of, "Angina pectoris arteriosclerotic cardiac vascular disease." He was discharged December 13, 1944, and nine days later signed the insurance application.

He died September 5, 1945, in the same hospital, and its record, so far as is here pertinent, reveals: "H. P. I. In December, 1944, patient was in this hospital with the same condition. . . . He left here after extensive cardiac study, and told he had no organic cardiac disorder. . . . P. H. Patient does not recall childhood illness. Hasn't had any serious illness except that on December of 1944."

Defendant's contest is based upon the insured's failure to report the hospitalization and illness he had shortly before signing the application. This, it contends,

---

[2] "H. P. I." means "History of Present Illness," the patient's narrative to the doctor. "P. H." means "Past History."

was a false representation, a concealment of a fact material to the risk.

In issues of this character, *Evans v. Penn Mutual Life Ins. Co.*, 322 Pa. 547, 186 A. 133, is the basic authority. At page 560, Mr. Justice DREW, after thoroughly reviewing the cases, lucidly summarized the guiding principles applicable to this appeal: "(2) Where the statements are made representations, the insurer, to avoid the policy, must show they were false and insured knew they were false or otherwise acted in bad faith in making them. (3) If such falsity and the requisite bad faith affirmatively appear (a) from competent and uncontradicted documentary evidence, such as hospital records, proofs of death, or admissions in the pleadings, or (b) from the uncontradicted testimony of plaintiff's own witnesses, a verdict may be directed for the insurer."

More especially relevant to the instant case is the statement on page 553: "The insurer must thus establish, in order to avoid the policy in the case of representations, that the statements relied on were falsely and fraudulently made. It is sufficient to show that they were false in fact and that insured knew they were false when he made them [citing cases] since an answer known by insured to be false when made is presumptively fraudulent. Fraud may also be assumed from a showing that insured made false statements although fully aware that he did not know whether or not they were true, and that they had a tendency to and did mislead the insurer. The circumstances preceding and attending the making of the statements may be such that the insured must be said to have been aware of their falsity at the time, or that an inference of fraud is otherwise irresistible, as for instance where an unreported illness or disability of insured was so serious and so recent that he could not have forgotten it."

To establish insured's good faith, plaintiff called Dr. Stecher, who had attended the insured in the hospital.

He testified that he had made the diagnosis appearing on the hospital record, but that, since the insured was "an apprehensive man", and was "rather upset and nervous about his condition", he "told him nothing about having heart trouble", and advised him that "he had nothing to be greatly concerned with." This testimony and the hospital record establish, we think, that insured was *not aware of his heart condition.* But, when he signed the application, he *knew that he had been ill and that he had been confined to a hospital.* Moreover, his statement in the hospital during his last illness shows that he had realized that the December, 1944, illness was serious.

Plaintiff does not contend otherwise. Her contention is that he remembered the hospitalization and reported it to defendant's medical examiner who, deeming it unimportant, did not record the answer. Over defendant's objection she was permitted to testify that she was present when defendant's examiner took the insured's answers. Her testimony follows: "By Mr. Bricklin: Q. What was your husband's answer to the question, No. 18, 'Have you ever received, or applied for treatment at, or attended, any hospital, dispensary, sanitarium, cure, or other institution'? A. He answered that he had been to the hospital for an operation, and also—" [objection by defendant, and ruling by the court]. The witness, continuing: "That he had been to the hospital for observation,[3] and the doctor [examiner] asked what they told him, and he said they told him he was a normal man. The doctor [examiner] said the first trip was important but the second trip wasn't important."

Assuming for the moment that her testimony was admissible, it is at once apparent that it does not establish or tend to establish the insured's good faith. It

---

[3] In plaintiff's reply to new matter she "averred that said hospital confinement was for a mere routine observation."

proves the opposite. He did not answer the question in good faith. He had not been to the hospital for an observation. He had been suddenly seized with sharp, aching pains while at work, perspired freely, "blacked out and fainted." He was taken home, "where he had nausea, vomiting and B. M." He called for a doctor, who was not available, and the police took him to the hospital in an ambulance. He remained there for six days, during which time at least two electrocardiograms were made. He had had a severe ailment, an acute attack, as he himself realized. Calling this experience an "observation" was patently a perversion of the truth; it was a half truth, the more deceiving because it concealed the whole truth, and suppressed important and grave details. It was a diluted, garbled, and a false version of what actually occurred. It did not meet the requirements of good faith. It did not square with the certificate in which he affirmed that his answers were *"complete,* true and correctly recorded." (Emphasis added.) "Good faith required complete and correct answers": *Glaser v. Prudential Ins. Co.,* 157 Pa. Superior Ct. 471, 475, 43 A. 2d 534.

Not having told the whole truth, having stated that he had been to a hospital for only an observation, without relating the circumstances in which he was taken there, the number of days he spent there, and the examinations made of him, the examiner naturally dismissed it as a trivial affair when as a matter of fact, known and recognized by the insured but unknown by and unrevealed to the examiner, he had had a grave illness. His statement to the examiner "had a tendency to and did mislead the insurer": *Evans* case, supra, p. 553.

Had he revealed the whole truth and had the examiner dismissed the answer as too trivial for recording, or for any other reason failed to record it, plaintiff would have shown good faith. If plaintiff had contended that, notwithstanding the provisions in the application

respecting notice to agents, defendant actually had notice through its examiner of insured's serious illness and hospitalization, another legal question would have arisen. As it is, the most that can be said of plaintiff's testimony is that it proves that the company had notice through its examiner that the insured had been in a hospital only for an observation—and that may have been regarded as immaterial to the risk.

However, according to *Prevete v. Metropolitan Life Ins. Co.*, 343 Pa. 365, 22 A. 2d 691, almost a replica of the instant case, plaintiff's testimony was not admissible. There the insured negatively answered inquiries relating to injuries, treatments by physicians, and compensation benefits. As here, he certified that his answers were correctly written and were full, true and complete. It was shown that five months previously he had injured his back, had been confined to a hospital for five days, and had received workmen's compensation benefits. His beneficiary was permitted to testify that she was present at the medical examination and that the insured told the examiner of his injury, hospitalization, medical treatment and the compensation received. As here, the testimony did not show a "trick or effort on the part of defendant's physician to prevent either insured or plaintiff, who was present at the time and able to read, from seeing the application before insured signed it."

Mr. Justice DREW entered this emphatic pronouncement (p. 368): "In the present controversy, plaintiff admits that the answers in the application are false. Then, in view of insured's unqualified certification that he had read these false answers before signing the application, that they were correctly written as given by him, and that they were true and complete, how can it be said that he did not know the answers were false and did not deliberately intend to deceive the company? In such a situation the necessary and inevitable conclusion is that insured did not act in good faith when he signed the

application, and the policy should have been avoided without the intervention of a jury. *His beneficiary should not have been heard to say that insured gave other answers than those set forth in the application. To permit such a thing would be to open wide the door to fraud. . . .* That insured knew, under the circumstances of the instant case, that the answers recorded in the application were false when he certified that they were true is as patent as where a beneficiary attempts to establish good faith on the part of an insured who failed to report a serious and recent illness by the claim that he had inadvertently overlooked or had forgotten it." (Emphasis added.) See also *Shugats v. Metropolitan Life Ins. Co.*, 153 Pa. Superior Ct. 51, 33 A. 2d 650; *Anastasio v. Metropolitan Life Ins. Co.*, 149 Pa. Superior Ct. 414, 27 A. 2d 510; *Kasmer v. Metropolitan Life Ins. Co.*, 140 Pa. Superior Ct. 46, 12 A. 2d 805, where the same rule was applied. The rule is apparently founded upon the presence and the terms of the certificate, and this factor distinguishes the *Prevete* case from other cases where there were no similar certificates.[4]

Even so, apart from the certificate and the question of the admissibility of evidence, the cases upon which plaintiff relies do not sustain her case. They arose in different factual situations. In the *Evans* case the insurer company relied, not upon unimpeached hospital records as here, but upon oral testimony and that cir-

---

[4] See: *Derr v. Mutual Life Ins. Co.*, 351 Pa. 554, 41 A. 2d 542; *Freedman v. Mutual Life Ins. Co.*, 342 Pa. 404, 21 A. 2d 81; *Bailey v. Pacific Mut. Life Ins. Co.*, 336 Pa. 62, 6 A. 2d 770; *Equitable Life Assurance Soc. v. McCausland*, 331 Pa. 107, 200 A. 85; *Applebaum v. Empire State Life Assurance Society*, 311 Pa. 221, 166 A. 768; *Matovich v. Mutual Benefit Health & Accident Assn.*, 157 Pa. Superior Ct. 604; 43 A. 2d 648; *Cypher v. Nat. Accident & Health Ins. Co.*, 155 Pa. Superior Ct. 487, 38 A. 2d 543; *Richardson v. Alta Life Ins. Co.*, 153 Pa. Superior Ct. 310, 33 A. 2d 783; *Soltaniuk v. Metropolitan Life Ins. Co.*, 133 Pa. Superior Ct. 139, 2 A. 2d 501; *Baxter v. N. Y. Life Ins. Co.*, 115 Pa. Superior Ct. 287, 175 A. 899.

cumstance necessarily carried the issue to the jury. In *Suravitz v. Prudential Ins. Co.*, 244 Pa. 582, 91 A. 495,[5] the insured, an illiterate foreign woman, failed to state a physical condition of which she might have been ignorant. *DeRosa v. Equitable Life Assurance Soc.*, 153 Pa. Superior Ct. 33, 33 A. 2d 495, plaintiff had suggested to the company's agent that he consult his wife's physician before she signed the application and the examiner was assured that "there was nothing detrimental"; and, more significant, the "inception and the development" of the disease "came after the policy was delivered." The remainder of her cases relate to minor illnesses, and are not relevant here.

Since the uncontradicted hospital records revealed falsity, and the circumstances attending the making of the statements are such that the insured must be said to have been aware of their falsity at the time, defendant was entitled to binding instructions.

The judgment is reversed and is here entered for the defendant.[6]

---

[5] For the interesting sequel, see the same case at 261 Pa. 390, 104 A. 754.

[6] The pleadings indicate that defendant deposited $54.00, premium paid by insured, in the court below to await the outcome of this action. Assuming that the deposit will be paid to plaintiff upon surrender and cancellation of the policy, the judgment has been reversed. If an order is required in respect of the deposit it will be made by the court below or, upon application, by this Court. See *Derr v. Mutual Life Ins. Co.*, 351 Pa. 554, 41 A. 2d 542, where likewise a deposit had been made, and a similar judgment was entered by the Supreme Court.