Odessa WOODS

v.

The NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, a Tennessee Corporation, Appellant.

No. 16057.

United States Court of Appeals
Third Circuit.

Argued Feb. 10, 1967.

Decided July 7, 1967.

· Richard C. Witt, Pittsburgh, Pa. (Thomas Lewis Jones, White, Jones & Gregg, Pittsburgh, Pa., on the brief), for appellant.

Byrd B. Brown, Pittsburgh, Pa. (Utterback, Brown & Harper, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, HASTIE, and FORMAN, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This is the second appeal in an action by Odessa Woods, beneficiary of an insurance policy issued on the life of her late husband, Emmett F. Woods, to recover the proceeds thereof from the insurer, National Life and Accident Insurance Company. The issue is whether Mr. Woods knowingly gave materially false answers in his application for insurance, which under Pennsylvania law would preclude recovery by his beneficiary. In the first appeal, reported at 347 F.2d 760 (1965), we reversed a judgment in favor of the beneficiary because certain evidence had been excluded by the trial court to the detriment of the insurer, and remanded for a new trial. The majority opinion did not reach the issue of whether the insurance company was entitled to a directed verdict because it had failed to file a motion for judgment n. o. v. in the trial court. In the second trial by jury, a verdict was again returned in favor of the beneficiary and judgment entered thereon. This is the appeal of the insurance company from an order of the District Court denying its motion for judgment n. o. v. or for a new trial. Because the facts of this case are detailed in the first opinion, we shall make reference to them thereafter only as may be necessary for consideration of the present issues or to indicate evidence different from that in the first trial.

The first error alleged is the failure of the Trial Judge to admit all four pages of Exhibit G, which was a "Report of Medical Examiner for Disability Evaluation" regarding one Emmett F. Woods, prepared by Dr. Harold T. Brown, who was chief of the pulmonary disease unit of the Veterans Administration Regional Office in Pittsburgh. Only the first page of the document was admitted into evidence. The content of the excluded second and third pages was so sparse, however, that their inclusion or exclusion would have been harmless error, and we shall not hereafter make mention of them. The fourth page, which contained important diagnostic conclusions, was excluded by the Trial Judge on the ground that "medical opinions from files are not good,"[1] in express reliance upon this court's decision in Masterson v. Pennsylvania R. R. Co.[2]

Page 4 revealed that an x-ray of the patient's chest showed a "finely nodular involvement upper $\frac{2}{3}$ of both lungs including apices" and the further notation "Timed vital capacity: one sec. 83%; 3 sec. 90%; total 59% of predicted. Marked restrictive defect, consistent with any of conditions noted under 46. Hospitalization for study advised." Under "46. DIAGNOSIS," the entry read, "Pulmonary infiltration, unknown origin, sarcoidosis, pulmonary mycosis, and bronchiolitis to be ruled out." It further revealed that the examinee would not accept hospitalization. The report was signed in handwriting as "Harold T. Brown," and the date "December 29, 1960," was stamped under the heading "DATE SIGNED," indicating its execution contemporaneously with the physical examination, and a second stamp dated January 9, 1961 showed the receipt of the report by the Veterans Administration Adjudication Division.

1. The precise ground of objection is not clear from the record. At sidebar conference, counsel for the plaintiff argued the inadmissibility of page four on the grounds that there was no proof that the report was executed contemporaneously with the examination nor that the signature on the report was that of Dr. Brown. Following this, however, in response to a question by the court, plaintiff's counsel stated, "Well, I am not going to object to any of it. But I think * * * my objection to the question of medical conclusions is much stronger." The trial judge then excluded the testimony on the ground stated in the text.

2. 182 F.2d 793 (3 Cir. 1950).

■ In the prior appeal the majority opinion stated that the exclusion of Exhibit G was "highly prejudicial to the defendant's defense" [3] without distinguishing between the various pages of the medical report. However, consideration of the objection here posed to the fourth page is not foreclosed by the decision in the prior appeal since the appellee's objection in the first trial was on the different ground of privileged communications, and there was no reason for the appellee to have made additional objections because its first was sustained by the trial court. [4]

■ In the *Masterson* case, supra, an action by an injured railroadman against his employer under the Federal Employers' Liability Act, it was held that two letters sent to the railroad's chief medical examiner, purporting to be signed by two doctors, were inadmissible under both the Federal Business Records Act [5] and the analogous Pennsylvania statute, [6] though in the circumstances of that case we found the error to have been harmless. "Each letter indicated that the plaintiff had been examined by the writer and stated certain facts with respect to his history and condition together with the writer's findings and conclusions." [7] The clarity with which the *Masterson* opinion specifies its grounds for decision permits a ready demonstration of the radical difference between the character of the proffer there and that of the present case. The two letters involved were not business records

of the railroad, having been sent to it by outsiders; nor were the letters in form original business records of the writing physicians. In contrast, the medical report here is manifestly a business record of the Veterans Administration. Also the physicians there were not made available for cross-examination, while here Dr. Brown was examined and cross-examined at the first trial and a transcript of that testimony was read to the jury at the second trial when it was established that Dr. Brown was in retirement in Florida and was not in sufficient health to return to testify again. [8] Furthermore, it was not established in the *Masterson* case that the letters were prepared by or under the direction of the physicians, while here the report was identified by Dr. Brown as his own and in his handwriting. [9] Finally, the letters in *Masterson* were the purported business records of *private* persons and required special testimony as to contemporaneous recording and regularity of procedure under 28 U.S.C. § 1732 to permit admission into evidence. Here, however, Exhibit G was shown by its custodian to have been an official record of a department of the federal government and was entitled to a presumption of authenticity under a long standing rule of evidence enunciated by this court that "when a public officer is required, either by statute or by the nature of his duty to keep records of transactions occurring in the course of his public service, the records thus made are * * ordinarily admissible." [10] We therefore

3. 347 F.2d at 766–767.

4. See McCormick, Evidence, § 52, p. 117 (1954).

5. 28 U.S.C. § 1732.

6. 28 Pa.Stat.Ann. 91b.

7. 182 F.2d at 796.

8. The only real difference between a medical diagnostic report and other varieties of business entries is that in certain cases its complexity or subjective nature may in fairness require that its author be available in court for examination to explore the basis and content of his conclusions. See McCormick, Evidence, § 290, pp. 612–

613 (1954). The court appearance of Dr. Brown obviated this problem.

9. In the first trial plaintiff's counsel, commencing cross-examination asked "This is the report of the doctor?" to which Dr. Brown replied, "Yes. It is." Additionally, plaintiff's counsel asked, "Could I look at your report, Doctor?" and Dr. Brown responded, "This is my writing."

10. Chesapeake & Delaware Canal Co. v. United States, 240 F. 903, 907 (3 Cir. 1917), aff'd 250 U.S. 123, 39 S.Ct. 407, 63 L.Ed. 889 (1919); see 28 U.S.C. § 1733.

conclude that it was error not to have admitted page four of Exhibit G.

The appellee nevertheless contends that the exclusion of page four was harmless error in light of the reading of the testimony of Dr. Brown given at the first trial. We agree. Dr. Brown's testimony at the first trial included and expanded upon substantially all the information contained on page four. The primary importance of Exhibit G that caused the prior majority opinion to term its exclusion prejudicial was the signature of Emmett Woods on the first page of the exhibit, which, when compared with the signature on the application for life insurance showed that the insured party and the person examined by Dr. Brown were one and the same. Page one was admitted into evidence at the second trial. Moreover, the corroborative value of the writing insofar as Dr. Brown's diagnosis was concerned was much weakened, because Dr. Brown used that very document to refresh his memory, and thus to the extent he did so and relied upon the document, the purported corroboration would have been merely circular support. Finally, it should be noted that the document has importance over and above the identical oral testimony of Dr. Brown for the purpose of a directed verdict only if this court were bound by the Pennsylvania rule that where fraudulent representations do not appear from the testimony of the beneficiary's own witnesses, a directed verdict is available solely on uncontradicted documentary evidence.[11] This issue is, however, academic in present circumstances since it appears that on all the evidence a judgment n. o. v. is not appropriate.

We grant at the outset that the issue of identity was conclusive in the insurer's favor—that is, comparing signatures, birthdates and birthplaces and addresses, and utilizing the Veterans Administration claim number, there is no doubt that the Emmett F. Woods involved in the following transactions is one and the same. Supporting the same conclusion is the authorization by Mr. Woods, on page one of Exhibit G, for the release of medical reports to Dr. C. E. Greenlee of 6547 Frankstown Avenue, Pittsburgh. With that established, the facts are that on September 6, 1960 Mr. Woods visited Dr. Charles E. Greenlee, whom he told that he had pleurisy before leaving the service and was then suffering from a violent cough upon arising each morning. Dr. Greenlee detected "high pitched rales" in the patient's chest due to some undetermined bronchial constriction, and gave Mr. Woods a prescription for a solution containing potassium iodide and for acromyacin. But, Dr. Greenlee testified that he did not thereafter see the patient and that from the appearance of his records he did not believe that Mr. Woods had "much wrong with him"; that he did not remember telling the patient anything, and that he didn't think the problem was "a serious matter."

Approximately three and a half months later, Mr. Woods was examined by Dr. Harold T. Brown at the Veterans Administration Hospital in Pittsburgh, at which time he complained of an "irritative cough, short of breath on exertion."

Among the abnormalities noted in Dr. Brown's examinations were "a finely nodular involvement" or "infiltration" of the lungs, and a lessened "vital capacity." He recorded a diagnosis, qualified in oral testimony as a "tentative diagnosis," of "sarcoidosis, pulmonary mycosis, and bronchiolitis to be ruled out." Dr. Brown testified that pulmonary sarcoidosis was "a very chronic and progressive disease. Becomes disabling in time and ten percent of the time it will kill the patient ultimately"; that pulmonary mycosis is "a fungus disease of the lung"; and that bronchiolitis "is really a symptom. Means only you have a cough." He advised Mr. Woods to go to a hospital *for further study,* but the examinee

11. Evans v. Penn Mut. Life Ins. Co., 322 Pa. 547, 557, 560, 186 A. 133 (1936).

declined. Less than three months later, on March 7, 1961, Mr. Woods filled out an application for life insurance with the appellant in which he gave a negative answer to Question 51(b) "Have you ever had any ailment or disease of * * heart or lungs?" And in response to Question 55, "State names and addresses of physicians you have ever consulted and give the occasion by reference to question numbers and letters above," he replied "None." On March 13, 1961, Mr. Woods was examined by the insurance company's own doctor who found "the respiratory murmur clear and distinct over both lungs," found "all organs of respiration * * * free of evidence of disease, either past or present," and rated Mr. Woods as a "first class" risk. The insurance policy was issued on March 21, 1961.

■ On August 31, 1962, within the two year contestable period of the policy, Mr. Woods died as a result of an attack of infectious hepatitis. There was no testimony linking the cause of death with the alleged concealed ailment.[12]

■ The relevant Pennsylvania law is set forth in the decision of the prior appeal:[13]

"* * * The situations under which false statements in an application will bar recovery on the policy are set forth in § 622 of the Pennsylvania Insurance Company Law of May 17, 1921, P.L. 682, art. VI, 40 P.S. § 757. This section provides: 'The

falsity of any statement in the application for any policy * * * shall not bar the right to recovery thereunder, unless such false statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.' To prove that a 'false statement was made with actual intent to deceive' all the insurer need show is that the insured knew that it was false or otherwise acted in bad faith in making it. Evans v. Penn Mutual Life Ins. Co., 322 Pa. 547, 560, 186 A. 133 (1936). * * * "

The *Evans* case, supra, also states that to establish that representations were falsely and fraudulently made, "It is sufficient to show that they were *false in fact* and that insured *knew they were false* when he made them."[14] Knowledge of the falsity can be proved by showing that the circumstances were such that the applicant must have had such knowledge.[15] In sum, avoidance of the policy in this case depends upon a showing of three facts: (1) the answer was false in fact; (2) the insured knew or must have known of the falsity; (3) the answer was material to the risk. On this appeal from a denial of a motion for judgment n. o. v. we must, of course, view the evidence most strongly in favor of the appellee.[16]

■ The answer to Question 51(b) denying any ailment of the lungs, meets only two of these three tests. There is no doubt of the materiality of the

---

12. The fact that Mr. Woods died from a cause unrelated to the allegedly concealed ailment "is not controlling. The materiality of the statements went to the risk assumed, not to the loss incurred." Shafer v. John Hancock Mut. Life Ins. Co., 410 Pa. 394, 400, 189 A.2d 234 (1963). The presence or absence of proof of death from the concealed ailment does, however, appear to have some relevance in determining the seriousness of the ailment involved. See Evans v. Penn Mut. Life Ins. Co., 322 Pa. 547, 563, 186 A. 133 (1936). Such proof would also ob-

viously show that the applicant did actually have the alleged disease—a fact, as will be demonstrated infra, not firmly established in the present case.

13. 347 F.2d at 767.

14. 322 Pa. at 553, 186 A. at 138 (Italics supplied.)

15. Deer v. Mutual Life Ins. Co., 351 Pa. 554, 559, 41 A.2d 542 (1945).

16. Walsh v. Miehle-Gross-Dexter, Inc., 378 F.2d 409 (3 Cir. 1967).

answer; nor that Mr. Woods had sufficient information to know that there might be something seriously wrong with him. But a jury would not be required to find that Mr. Woods *in fact* suffered from a lung disease or ailment of any seriousness. While sarcoidosis and mycosis were part of Dr. Brown's "tentative diagnosis," [17] the jury, also considering Dr. Greenlee's mild testimony, could have found that the insurance company had not shown that Mr. Woods had any defect at all, or that if he did, it was anything more than bronchiolitis, and Dr. Brown had used this term to mean only a symptom—a cough without any determined pathological cause. Also we must conclude from the testimony that the X-rays showing lung infiltration could be consistent with this lesser condition.[18] Without further evidence, the jury was not obligated to assume that Mr. Woods was afflicted with either of the two significant maladies, particularly since the burden of the demonstration lay with the insurer.

■ As to Question 55, requesting the names and addresses of physicians "consulted," two instances, the examinations by Dr. Greenlee and Dr. Brown have apparent relevance. In the prior

appeal, on the question of whether the examination by a Veterans Administration physician was a "personal consultation" within the meaning of the question posed, the majority opinion stated that if it had been established by evidence that "the applicant was directed by the VA to see Dr. Brown and that the report of the results of the latter's examination was for the eyes of the VA adjudication section." [19] then we would not oblige Mr. Woods to have listed his examination by Dr. Brown. The concurring opinion in the prior appeal took the position that the "recognized closeness of the question of whether that examination was a consultation inveighs against construing the * * * answer * * * as one that he must have known to have been false * * * " [20] In any event, the failure of proof at the first trial was cured in this case by an oral stipulation of counsel which satisfies the demonstration which the prior majority opinion stated as determinative of the issue.[21] The Trial Judge so charged the jury, and no appeal has been taken from this point of the charge. We therefore cannot find the requisite fraud on the failure to list Dr. Brown in answer to Question 55.

17. Doubts as to the specificity of the diagnosis were established by Dr. Brown's own testimony:
"Question [by the Court] Then is a tentative diagnosis one which you have made and think there may be some doubt about it or that it should be checked up by further tests?
"Dr. Brown: That is correct, your honor."

18. Dr. Brown testified, "The X-ray * * * showed a very fine infiltrative involvement of both lungs, a little more extensive on the right side involving the apices. That is the upper part of the lung, and as I say, *not absolutely characteristic of anything* but suggestive of sarcoidosis." (Italics supplied.)

19. 347 F.2d at 765.

20. 347 F.2d at 770.

21. At sidebar the following accord was reached:

"Mr. Brown [Plaintiff's counsel]: No, your Honor, I am simply contending what I think is the procedure, and I think Mr. Witt will stipulate that whoever Dr. Brown examined on the 29th, somehow he got in the Veterans Administration process.
"Mr. Witt: [Defendant's counsel]: And he treated him in the normal process of their business.
"Mr. Brown: That he was sent to Dr. Brown.
"Mr. Witt: I agree to that.
"Mr. Brown: Dr. Brown treated him in the normal process of the Veterans Administration business. His reports were for the Veterans Administration. He was working for the Veterans Administration. That the patient had no choice with respect to whether it would be Dr. Brown or Dr. Jones or whatever doctor might be employed, with the Veterans Administration.
"Mr. Witt: I agree to that."

■ We are thus left with the failure of Mr. Woods to list his visit to Dr. Greenlee six months before he applied for insurance. The difficulty in the contention that this omission shows fraud and bad faith is that Question 55 as worded did not clearly require such an answer. It read, "State names and addresses of physicians you have ever consulted *and give the occasion by reference to question numbers and letters above.*" (Italics supplied.) The question does not merely ask for any or all visits made by the applicant to a physician; rather, it could reasonably be concluded that the only consultations encompassed by the question were those in connection with the preceding disease inquiries denoted by the "numbers and letters above." [22] Since the proof does not show that Mr. Woods in fact had any disease of the "heart or lungs" and that he could therefore have answered "no" to Question 51(b), and because there were no other relevant disease inquiries, it also follows that fraud cannot be imputed by reason of the answer "None" to Question 55 as so phrased.

The posture of this decision is not a comfortable one. Taken as a whole, Mr. Woods' conduct does not deserve approval. But there is an obvious gap in Pennsylvania law between uncommendable conduct and exculpatory proof of fraud. The insurance company has the opportunity to control the phraseology of its questionnaire, did in fact conduct its own medical examination, and having agreed to insure Mr. Woods was required to prove fraud as specifically defined by Pennsylvania law if it sought to avoid the policy. While its case showed an applicant who probably believed he was ill, there was a clear failure of uncontradicted proof that he was in fact ill. Mere proof of Mr. Woods' concern regarding his state of health did not show that the question was falsely answered nor that the insurer's risk was actually increased. What protection the insurance company might have gleaned from knowledge of the visit to Dr. Greenlee is uncertain since his diagnosis, or lack thereof, tended to confirm the applicant's general appearance of good health. This question aside, by linking the question of medical attendance with its question on specific diseases, the application for insurance narrowed its scope of inquiry to the extent that the circumstance of Mr. Woods' visit to Dr. Greenlee was not clearly included. We must therefore conclude that if there were fraud on the part of Mr. Woods, it has not been evidenced so as to permit the entry of a judgment n. o. v.[23]

Hence the order of the United States District Court for the Western District of Pennsylvania of June 3, 1966 will be affirmed.

22. The inclination of the Pennsylvania Supreme Court to construe questions in an application strongly against the insurance company is manifest from its most recent decision in this area, where it held that a question asking if the applicant had any disturbance of the "brain or nerves" could easily be taken to exclude a "nervous disorder as such" and could refer to the physical nerves of the body rather than "a network breakdown of nerves." Schliefer v. Nationwide Life Ins. Co., 421 Pa. 359, 362, 219 A.2d 692 (1966).

23. Some of the conclusions stated herein are not consistent with the view taken in the concurring opinion in the prior appeal, 347 F.2d at 772. However, a more careful scrutiny of the evidence compels adherence to the above analysis.