STUMPF, ET AL. *v.* STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

[No. 113, September Term, 1968.]

698

*Decided March 20, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*Howard W. Gilbert, Jr.,* and *Harry I. Stegmaier,* with whom
were *Ottinger, Mackley & Gilbert, Edward J. Ryan, Francis
B. Burch, Attorney General,* and *William E. Brannan, Assis-
tant Attorney General,* on the brief, for appellants.

*William H. Geppert* and *Hugh A. McMullen,* with whom
were *Gunter & Geppert* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellants, Wilma Rose Stumpf, her husband, Clifford
Forrest Stumpf, Sr., and the two Stumpfs as surviving parents
of their son, Clifford Forrest Stumpf, Jr., sued Donald Leon
Nines, the named insured in an Assigned Risk Policy, carried
by the appellee, State Farm Mutual Automobile Insurance Com-
pany (State Farm), in the Circuit Court for Allegany County
for damages resulting from an automobile accident on Hender-
son Boulevard in Cumberland on April 14, 1965, in which Mrs.
Stumpf was seriously injured and her infant son killed when
Nines' automobile ran over the sidewalk and struck them. Judg-
ments were rendered against Nines in favor of Mrs. Stumpf
for $40,000, in favor of Mr. Stumpf for $25,000 and in favor
of the Stumpfs as surviving parents of their infant son for
$3,000, together with the court costs. Executions were duly is-
sued on the judgments and were returned "Nulla Bona." The
judgments not having been satisfied, and more than 75 days
having elapsed since their rendition, the appellants sued State
Farm in the Circuit Court for Allegany County (Getty, J.) to
recover the amounts due on the judgments. The Circuit Court
entered a judgment for State Farm on April 18, 1968, and the
appellants took a timely appeal to this Court from that judg-
ment.

On May 13, 1964, Nines applied for automobile insurance through David M. Watson, an independent insurance broker in Cumberland. Nines had been turned down by another insurance company, so that it was necessary to file an application for automobile insurance through the Maryland Assigned Risk Plan. Watson testified that he typed the application in his office, inserting in the application forms the answers given him by Nines. Thereafter the application was signed by Nines and notarized by Watson. There is a certification that Watson had read the assigned risk plan for this State, had explained those provisions to the applicant, and had included in the application "all required information given to me by the applicant." Question 16 on the application form states: "Has Applicant (or anyone who usually drives the applicant's motor vehicle) any mental or physical disability?" The response to that question was "No" typed in the space provided for the answer.

The Maryland Automobile Assigned Risk Plan, Section 9, entitled "Eligibility" provides in relevant part:

"An applicant shall be considered eligible if he reports all information of a material nature, and does not make incorrect or misleading statements, in the prescribed application form, or does not come within any of the prohibitions or exclusions listed below.

"A risk shall not be entitled to insurance nor shall any subscriber be required to afford or continue insurance under the following circumstances."

Then follow six provisions, the one relevant to the present case being:

"(E) If the applicant or any one who usually drives the automobile is subject to epilepsy, * * *."

The Maryland Automobile Assigned Risk Plan was promulgated by the insurance companies doing business in Maryland, subject to approval by the Insurance Commissioner, for an equitable apportionment among them of applications for automobile insurance for "applicants who are in good faith entitled to but who are unable to procure such insurance through ordinary methods," and the insurers "may agree among themselves

on the use of reasonable rate modifications for such insurance," the rate also being subject to the approval of the Insurance Commissioner. Code (1957), Article 48A, Section 223 (15), Laws of 1949, Chapter 511.[1]

State Farm in the policy issued in this case, agreed to pay on behalf of the insured all sums which the insured "shall become legally obligated to pay as damages because of bodily injury, sickness or disease including death at any time resulting therefrom, sustained by any person caused by accident and arising out of the ownership or use of the automobile." The policy was issued for one year beginning May 19, 1964 for coverages in the amount of $15,000 for each person with a maximum of $30,000 for each occurrence. The policy in Condition 16 provided:

> "16. Declarations. By acceptance of this policy the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

There was no dispute that Nines was subject to epileptic seizures. Nines had been in the Marine Corps from September 1953 to September 1963. He had his first epileptic seizure on February 19, 1958 in Okinawa, possibly as a result of a traumatic injury. Nines was put on temporary retirement in October 1959 after which he received extensive treatment and received a medical discharge from the Marine Corps on September 1, 1963, "Diagnosis, epilepsy." He received from the Government of the United States a 30% disability pension and has continued to receive treatment and medication from a Naval Hospital.

---

1. Article 48A, Section 223 (15) is now Article 48A, Section 243 (1968 Replacement Vol.). See subsection (n). The provisions of the original statute were, substantially amended and amplified by the Act of 1966, Chapter 462, but these amendments have no effect upon the decision in the present case.

In September 1959, Nines, in his application for a Maryland motor vehicle operator's license, was asked, "Have you had or been treated for fainting or dizzy spells or epilepsy, paralysis or any other physical or mental disability?" He answered this question "No," signed the application and subscribed to it before a notary public. In subsequent applications for renewals of his operator's license, dated April 27, 1962 and May 2, 1964, he was asked, "Do you have any kind of mental disability which would affect your driving?" His answers in both instances were "No." Nines admitted that he had an epileptic seizure in August 1964.

On April 14, 1965, Nines, while driving his automobile on Henderson Boulevard in Cumberland, ran up on the sidewalk, seriously injuring Mrs. Stumpf and killing her young son, as we have stated. Corporal Moyer, of the Cumberland Police Department, was directing traffic at the intersection of Henderson Boulevard and Frederick Street at the time of the accident. He testified that immediately following the accident he observed Nines in his automobile. He stated that Nines was "thrashing about in his car * * * he was perspiring very heavily" and "there was slobber running down his face, down over the front of his jacket." When the officer questioned Nines, at times Nines "answered okay, other times he was very incoherent." Later, when questioned at the investigator's office, Corporal Moyer testified that Nines made the following statement:

> "He stated that he had had a seizure, and then went on to state that it must have been I think he called it a grand mal seizure, and that he had never had one of those before, that he had always had the small seizure, * * * he then explained to us the difference between the seizures. * * * the petit mal I believe it is and grand mal, and he said that he thought he had had the grand mal seizure this time."

Later, however, in his pretrial deposition which was admitted into evidence at the trial of the case, Nines stated that he did not have an epileptic seizure at the time of the accident, but had struck his head on the windshield. He said that he had stated that he had had an epileptic seizure because of the fear of a murder charge being placed against him.

On April 15, 1965, the day following the accident, the manager of the claims office of State Farm in Cumberland took a statement from Nines in which Nines disclosed the history of his epilepsy. The manager at the same time obtained from Nines an "Authorization for Claim Service and Non-Waiver of Rights" which authorized State Farm to investigate, negotiate, settle, deny or defend any claim arising out of the accident, but in which it was agreed that "such actions shall not waive any of the rights of the undersigned or of the Company under any contract of insurance."

Nines was charged with manslaughter as a result of the accident, but, because of the hospitalization of Mrs. Stumpf, the prosecuting witness, the trial was postponed until September 8, 1965. At the trial, a sworn statement given by Nines to the County Investigator was received, in which he disclosed that he had been under constant medication for these seizures since his retirement and was required to take three different medications four times a day. He described in some detail the type of epileptic seizures to which he was subject. He stated:

"I blacked out [at the accident] because of an epileptic seizure.

"Q. Can you describe the type of epileptic seizure? A. They have two classes, a grand mal and a petty mal. I had a petty mal.

"Q. How do you evaluate this one you had this evening as petty mal? A. Well, the last grand mal I had I was unconscious for four or five hours. This time I didn't have any notice of it coming on me, my tongue is not chewed, and the thing that is in common with a petty mal is that I am quite weak. I was probably only unconscious for a brief period of time."

Nines stated that he could not remember how he answered the question in regard to having any physical or mental defects or disability in his application for a driver's license and the subsequent renewal applications.

On October 12, 1965, State Farm notified Nines by letter that it was rescinding the policy as of the date of its issuance and was treating it as void from its inception. This action was

taken because of the material misrepresentation by Nines in his application in stating that he had no physical defects when in fact he did, and State Farm's reliance upon the statement in the application. It was further stated that if it had had knowledge of the matter at the time it would have rejected the application and declined to issue the policy. It enclosed its check for $52.20 as a return of premium, with a note that Watson owed Nines $5.80 for unearned commission. Later, on October 28, State Farm enclosed an additional check to Nines for $5.80. Nines cashed both checks.

At the trial of the case, the plaintiffs produced an expert medical witness and propounded a hypothetical question to him seeking to elicit the opinion of the witness, based on reasonable medical certainty or probability, whether or not the patient had a mental or physical disability. After the objection to this hypothetical question was sustained, the plaintiff proffered to prove by the medical expert that Nines did not have a physical or mental disability at the time of the accident. We will consider this matter more fully later in this opinion.

The trial court, sitting without a jury (a jury trial having been waived), filed a written opinion on April 18, 1968 in which, after carefully reviewing the evidence, it found as a fact that Nines "had a mental or physical disability at the time he completed the application for insurance and that the answers made by him were knowingly and intentionally false as well as material to the risk." The trial court further found that if State Farm had known of the misrepresentation it would not have issued the policy and further that State Farm acted within a reasonable time, under the circumstances of the case, in rescinding the policy and returning the premium. On the same day, the trial court passed an order rendering a judgment for the defendant, State Farm, and requiring the plaintiffs to pay the costs.

Four questions concerning the findings and rulings of the trial court are presented to us:

1. Was the trial court clearly erroneous in finding that the insured, Nines, had made a material misrepresentation in his application for insurance which justified State Farm in rescinding the policy?

2. Was the trial court clearly erroneous in finding that State Farm was not guilty of such unreasonable delay in asserting its right to rescind as would preclude it from rescinding the policy?

3. Did the trial court err in sustaining the objection of State Farm to the hypothetical question propounded to Nines' medical expert?

4. Was the insured, Nines, guilty of such lack of cooperation as to entitle State Farm to avoid its policy?

We are of the opinion that the first three questions should be answered in the negative and the judgment of the lower court should be affirmed. We, therefore, do not find it necessary to consider question 4, although the trial court expressed the opinion that the failure of Nines to cooperate also justified an avoidance of the policy by State Farm.

## 1.

The Maryland law in regard to misrepresentations in applications for automobile insurance justifying rescission of the policy by the insurer was aptly summarized in *Erie Insurance Exchange v. Lane,* 246 Md. 55, 227 A. 2d 231 (1967). In *Erie,* Judge Marbury, for the Court, stated:

> "A misrepresentation by the person insured, in the application for a policy of insurance covering the owner or his automobile against liability or damages, will not affect the validity of the policy, unless the representation relates to some matter which is material to the risk, or prejudicial to the company, or was not made in good faith by the applicant or unless, by virtue of the terms of the application and policy, it is made an affirmative warranty. 7 Blashfield, *Automobile Law and Practice,* Section 301.4. (246 Md. at 59, 227 A. 2d at 234.)
>
> * * *
>
> "The burden was on the insurer to establish the insured's fraud or misrepresentation in an application for insurance, *Sun Ins. Office v. Mallick, supra,* and, ordinarily, whether a representation in an insurance application was true or false, or material to the risk, is for the jury to determine. *Monumental Ins. Co. v.*

*Taylor,* 212 Md. 202, 129 A. 2d 103." (246 Md. at 63, 227 A. 2d at 236.)

The Maryland law is also well established that the provisions in the policy giving injured persons the right to sue the insurer do not enlarge the liability of the insurer, but merely enable the injured persons to succeed to the rights of the insured against the insurer, so that defenses which are effective against the insured are likewise effective against the injured persons. *Indemnity Ins. Co. v. Smith,* 197 Md. 160, 78 A. 2d 461 (1951); *American Automobile Insurance Co. v. Fidelity and Casualty Co.,* 159 Md. 631, 152 A. 523 (1930).

In *Indemnity Ins. Co. v. Smith, supra,* Judge Delaplaine, for the Court, stated:

> "The judgment creditor, who sues on a policy indemnifying the insured against claims for damages, stands in the shoes of the insured and is chargeable like the insured with any breach of conditions on which liability depended." (197 Md. at 165, 78 A. 2d at 463.)

See 45 C.J.S. *Insurance,* § 588 at 385-86 (1946); 46 C.J.S. *Insurance,* § 1191(3) at 112 (1946); 29A Am. Jur. *Insurance,* § 1489 at 599 (1960).

As we have indicated, the trial court, sitting without a jury, found that the insured, Nines, had a mental or physical disability when he completed the application for insurance, and his answer to the question concerning whether or not he had such a disability was knowingly and intentionally false. The trial court also found that the answer was material to the risk, and if State Farm had known of the misrepresentation, it would not have issued the policy. In our opinion, there was ample evidence to support the trial court's findings, and we shall not hold that his findings were clearly erroneous—the test established by Maryland Rule 885 in considering findings of the facts by a trial court, sitting without a jury.

(a)

The first question to be considered is whether or not epilepsy is to be considered to be a "mental or physical disability," and accordingly, whether Question 16, eliciting from Nines the in-

formation that he had "any mental or physical disability," was reasonably designed to obtain from him the information that he suffered from epilepsy. In our opinion, the answer is in the affirmative.

The inquiry addressed to the applicant for the automobile insurance must be reasonably designed to elicit from him the information which he possesses, material to the risk, as a condition precedent to the application of the rule that a failure to disclose may be a basis for the avoidance of the policy by the insurer. *Government Employees Insurance Co. v. Cain*, 226 F. Supp. 589 (D. Md. 1964). See also *Harris v. State Farm Mutual Automobile Ins. Co.*, 232 F. 2d 532 (6th Cir. 1956).

*Disability* is defined by *Webster's Third New International Dictionary* 642 (1961) as:

> "[T]he condition of being disabled; deprivation or lack especially of physical, intellectual, or emotional capacity or fitness * * * a physical or mental illness, injury, or condition that incapacitates in any way * * * a material object or condition that hinders, impedes or incapacitates; HANDICAP * * *."

*Epilepsy* is defined in *Stedman's Medical Dictionary* 536 (1966) as follows:

> "Epilepsy—A chronic nervous disorder, characterized by attacks of unconsciousness or convulsions or both, and sometimes associated in the later stages with mental disturbance." ·

Dr. Charles C. Spencer, the medical expert produced by Nines, described the two common forms of epilepsy as follows:

> "The most common form is grand mal epilepsy, and in this form a characteristic attack consists of a brief period of warning to the patient while he is still conscious, that he is about to have an attack. These are very vague in character and can't be succinctly described. Followed by a sudden cry and stiffening of the individual. He usually then falls to the ground if he is standing, or assumes a rigid position, stops breath-

ing, turns blue, then begins rapid jerking motions of the limbs of the body and the muscles of the trunk. This persists for several minutes. It is followed then by a period of relaxation and unconsciousness, which varies from several minutes to several hours. This in turn is followed by a period of drowsiness and frequently by headaches, sometimes even by a brief period of paralysis. Now a petit mal epilepsy, which is the second most frequent type, is a brief lapse of consciousness, is usually seen only in children or at least begins only in childhood ages."

It appears from the statements made by Nines to the investigating officer, to the County Attorney, to the State Farm agents and in his deposition, that he was familiar with both forms of epilepsy.

Then too, Nines was, or should have been, personally aware of the use of the words "physical or mental disability" as including "epilepsy." In his application for an operator's license in September 1959, prior to executing the application for the automobile insurance involved in this case, the fourth question propounded on the operator's license application was "Have you ever been treated for fainting or dizzy spells, *epilepsy,* heart trouble, paralysis or *any other physical or mental disability?"* (Emphasis supplied.) Nines falsely answered this question "No" as the specific language required a disclosure of whether he had been treated for "epilepsy" or any *other* "physical or mental disability." Nines knew at that time that he had indeed been treated for epilepsy and further he is charged with knowledge that epilepsy was possibly considered by the Commissioner of Motor Vehicles to be either a "physical or mental disability" as that general language follows a specific enumeration including the word "epilepsy."

Perhaps more importantly, Nines had received a medical discharge from the Marine Corps, "Diagnosis, epilepsy" and had received from the Government of the United States a pension based on a 30% *"disability."*

It would appear to be incontestable that Nines knew that he was receiving a *disability* pension on the basis of his epileptic

condition; further, his various statements, though sometimes conflicting and confusing, provide some evidence that he was aware that his condition was of interest to the Maryland Department of Motor Vehicles, concerning his fitness to operate a motor vehicle. Apart from these factors, it is clear to us that a person of ordinary intelligence could not have but realized that Question 16 required him to disclose his epileptic condition. At a bare minimum, Nines must have known that he suffered from a chronic condition which resulted in periodic attacks of convulsions or unconsciousness, and for which he required constant medication and occasional treatment. That such attacks are incapacitating, we believe, is equally incontestable. A reasonable construction of the word "disability" must apprehend that it includes partial as well as total disabilities. It provides no defense for Nines to argue that his condition rendered him incapacitated or disabled only sporadically. Nor is it relevant whether epilepsy is to be considered an illness or disease or merely symptomatic in itself, or whether it is pathological, congenital or traumatic in origin. We think that the wording "any mental or physical disability" amply covers all of these possibilities.

Question 16 in the application for insurance in this case is to be distinguished from the questions involved in the *Harris* and *Cain* cases, *supra.* In *Harris,* the question was whether or not the applicant had "any physical defect." The *only* medical testimony in that case was that epilepsy was not considered "as a physical defect in itself." The United States Court of Appeals for the Sixth Circuit indicated that under these circumstances, the answer "No" by the insured who had epilepsy did not render the answer false or fraudulent.

In *Cain* the language of the question was "9. Are you or any operator of the automobile physically or mentally impaired? (One eye, leg, arm, paralysis, etc.)." The insured, knowing that his wife who also operated the automobile, had epilepsy, answered "No." There was medical testimony in the case that epilepsy was not a "mental impairment," which the District Court accepted as a fact. The United States District Court for the District of Maryland held that because of the enumeration of physical or mental impairments, "one eye, leg, arm, paral-

ysis, etc." a person could reasonably conclude that epilepsy was not intended to be included. District Judge (now Circuit Judge) Winter stated:

> "Had question 9, insofar as it was directed to physical impairment, been limited to a general inquiry without illustration of physical impairment, the Court would be inclined to conclude that Mr. Cain at least unintentionally misrepresented the risk, and such misrepresentation provided grounds for avoiding the policy. But question 9 was not limited. It gave as illustrations of physical impairment: 'One eye, leg, arm, paralysis, etc.,' conditions all of which to a layman lacking medical training could be understood as referring to visible and continuous physical deficiencies. True, there was the catchall, 'etc.' To the extent that it has meaning, the Court concludes that *ejusdem generis* has application, and a person answering question 9 by reference to the specific examples and 'etc.' could reasonably conclude that epilepsy, the presence of which may be clinically demonstrated, but which manifests itself in gross only sporadically, was not the type of physical impairment inquired about or sought to be disclosed." (226 F. Supp. at 592.)

In the case at bar, Question 16 in the application uses the language "any physical or mental disability," rather than the words "physical defect" as in the *Harris* case. There was no medical testimony in the present case which would indicate that epilepsy was *neither* a physical nor a mental disability, and in addition, the insured here should have known that both the United States Government and the Maryland Department of Motor Vehicles considered his epilepsy to be a "disability," whether mental or physical. We also believe that the word "disability," especially when qualified by the phrase "mental or physical," is broader in scope than the word "defect."

We find the *Cain* case no more persuasive than *Harris*. In the present case, Question 16 contains no language of illustration or specification which would limit the normal broad meaning of the words; indeed, Judge Winter in *Cain* indicates that

he would have reached a different result had there been no specific enumeration of physical impairments. In addition, there is no medical testimony in the present case, as there was in *Cain,* that epilepsy is not a mental disability.

Under these circumstances we cannot conclude that the trial court, sitting as a jury, was clearly erroneous in finding that the insured, Nines, had a physical or mental disability at the time he completed the application and that the answer made by him was knowingly and intentionally false.

### (b)

We are also of the opinion that the trial court was not clearly erroneous in finding that the false representation was material to the risk.

Our predecessors in *Silberstein v. Massachusetts Mutual Life Ins. Co.,* 189 Md. 182, 55 A. 2d 334 (1947), held that:

> "It is a general rule in the law of contracts that where a party is induced to enter into a transaction with another party which he was under no duty to enter into by means of the latter's fraud or material misrepresentation the transaction is voidable as against the latter and all who stand in no better position. Thus, innocent material misrepresentation, even though not accompanied by negligence, has the same effect as fraud in rendering a contract voidable. *2 Restatement, Contracts,* sec. 476. We specifically hold that a material misrepresentation by an applicant for life insurance, in reliance upon which a policy is issued, avoids the policy, regardless of whether the misrepresentation was made intentionally or through mistake and in good faith, because it results in the assumption by the insurer of a risk different from that which the applicant led it to suppose it was assuming. (189 Md. at 187, 55 A. 2d at 337.)
>
>     * * *
>
> "A false representation in an application for insurance is material to the risk if it is such as would reasonably influence the insurer's decision as to whether

it should insure the applicant." (189 Md. at 190, 55 A. 2d at 338-39.)

*Silberstein* was cited with approval and followed in *Nationwide Mutual Insurance Co. v. McBriety,* 246 Md. 738, 230 A. 2d 81 (1967).

In *Silberstein,* the supervisor of the underwriting department of the insurer testified that if the company had been advised of the fact that the applicant had tumors, even though at the time of the application the tumors had been determined to be non-malignant, nevertheless the company in all probability would not have accepted the risk. This Court held that the false representation in that case was a material misrepresentation, falsely given, which permitted the insurer to cancel the policies and enjoin the making of claims under them. See also *Josey v. Allstate Insurance Co.,* 252 Md. 274, 250 A. 2d 256 (1969); *Millman v. Metropolitan Life Insurance Co.,* 249 Md. 635, 241 A. 2d 566 (1968); *Metropolitan Life Ins. Co. v. Samis,* 172 Md. 517, 192 A. 335 (1937); *Loving v. Mutual Life Ins. Co.,* 140 Md. 173, 117 A. 323 (1922); *Mutual Life Ins. Co. v. Mullan,* 107 Md. 457, 69 A. 385 (1908); *Bankers' Life Ins. Co. v. Miller,* 100 Md. 1, 59 A. 116 (1904).

In the instant case, Rudolph Toms, the underwriting superintendent of State Farm, whose department superintends the activities of indemnity personnel in the selection of applicants for insurance by the company, testified in regard to how risks under the Maryland Assigned Risk Plan were selected and that State Farm did not know, and had no way of knowing, that Nines, the applicant, had epilepsy. He testified that the company's policy was not to issue an insurance policy to anyone having epilepsy, and further, that if the company had known that Nines was subject to epileptic seizures, it would have refused to issue a policy under the Assigned Risk Plan.

Even apart from this rather conclusive testimony accepted by the trial court, it would seem clear that the insurer would hardly accept as a risk a person specifically declared to be ineligible under the Assigned Risk Plan and who in the operation of a motor vehicle would be likely to be rendered unconscious at any time, suddenly and without warning. The trial court's finding

that the false representation was material to the risk was not clearly erroneous.

Nines cannot escape the consequences of his false answer to the application on the ground that he did not read the application before signing it. There was evidence in the case, accepted by the trial court, that each question was read to Nines and that he answered the questions, the answers being inserted in the application form before he signed it. In any event, however, Nines would be bound by these answers in the signed application even if he did not read the application. See *Nationwide Mutual Insurance Co. v. McBriety, supra,* 246 Md. at 741-42, 230 A. 2d at 82-83 and the prior Maryland cases cited in the opinion in that case including *Commercial Cas. Ins. Co. v. Schmidt,* 166 Md. 562, 571, 171 A. 725, 729 (1934), from which the Court quoted with approval:

> "* * * fair dealing requires of the applicant or insured some care on his own part to see that his application does not misrepresent the facts." (246 Md. at 742, 230 A. 2d at 83.)

### 2.

The next question to be considered is whether or not the trial court was clearly erroneous in finding that State Farm was not guilty of such unreasonable delay in asserting its right to rescind the policy as would preclude it from rescinding it.

It is well established that in order to rescind effectively, the insurer "must proceed without unreasonable delay after the fraud is discovered to rescind the contract, and to manifest its determination to the other party." *Stiegler v. Eureka Life Ins. Co.,* 146 Md. 629, 642, 127 A. 397, 402 (1925). When the insurer makes a determination to rescind its policy it must return or offer to return the premiums received from the insured, *Stiegler, supra.*

As we have indicated, State Farm in its letter of October 12, 1965, notified Nines of the rescission of the policy as of the date of its issuance and enclosed its check for $52.20 for a return of premium, indicating that Watson, the agent, owed Nines $5.80 for unearned commission. Later on October 28, 1965, State Farm enclosed its additional check for the $5.80. Nines

cashed both checks, so that he received the return of the full amount of the premium.

Nines, however, contends that the insurer knew that he had epilepsy on April 15, 1965, the day after the accident, from a statement given State Farm by Nines himself. He argues that the delay of some six months in determining on October 1, 1965, to rescind, giving notice to Nines on October 12 and finally returning the entire balance of the premium on October 28 was an unreasonable delay in exercising any right of rescission so that it should be deemed waived and ineffective. This contention, however, overlooks several important facts.

It is correct as Nines indicates that his statement given State Farm on April 15 did indicate that he had been retired from the Marine Corps in 1958 because of epilepsy. The statement indicated, however, that prior to the accident Nines had only had one very mild attack and this was during 1964. The general impression from the April 15 statement was that the disease in his case was not serious, had no effect upon his ability to drive a motor vehicle, and that he had had no difficulty in obtaining an operator's license and various renewals of his operator's license entitling him to operate a motor vehicle in Maryland. The investigator for the insurer learned that Nines was charged with manslaughter for the death of the infant resulting from the accident and determined—reasonably in our opinion—to wait until the criminal trial was held so that the results of the investigation by the police would be available to him. The prosecuting witness, Mrs. Stumpf, as a result of the very serious injuries resulting from the accident which we have already mentioned, was confined to the hospital for a substantial period of time, with the result that the trial of the criminal case against Nines was postponed until September 8, 1965. It was at the trial of the case when the investigator first learned of the statement of *April 14, 1965* given by Nines to the County Investigator and of its contents as well as hearing the sworn testimony of Nines, the police officers and other witnesses. It was only then that the investigator for State Farm received the *full information* concerning the extent to which the epilepsy had affected the insured, *i.e.,* that as a result of the epilepsy Nines had been suddenly and abruptly rendered unconscious for vari-

ous periods of time, one as long as four hours in duration, and that he had had at least six violent epileptic seizures since his discharge from the Marine Corps. As a result of obtaining this full information, State Farm was able to determine that Nines had fraudulently misrepresented his condition to both the Department of Motor Vehicles and to the insurer in order to obtain insurance and a driver's license. It should also be kept in mind that, as we have stated, the manager of the Claims office of State Farm in Cumberland obtained from Nines an "Authorization for Claim Service and Non-Waiver of Rights" on April 15, 1965, the day following the accident, which indicated that State Farm was not waiving any of its rights by its acts in future investigation negotiations, settlement or defense of any claim arising out of the accident, so that Nines suffered no prejudice by the delay. We cannot say under these circumstances that the trial court was clearly erroneous in finding that State Farm was not guilty of such unreasonable delay in asserting its right to rescind as would preclude it from rescinding the policy.

### 3.

Finally, we will consider whether or not the trial court erred in sustaining State Farm's objection to the hypothetical question propounded to Dr. Spencer, Nines' medical expert.

Dr. Spencer, a specialist in internal medicine, was called by Nines as an expert witness. Dr. Spencer testified that he had never examined Nines nor had he heard all of the testimony in the case. It was therefore necessary for Nines to ask Dr. Spencer a hypothetical question in order to obtain the opinion sought from Dr. Spencer.

It is well settled in Maryland that the hypothetical question "should contain a fair summary of the material facts in evidence essential to the formulation of a rational opinion concerning the matter to which it relates * * *." *Wolfinger v. Frey,* 223 Md. 184, 192, 162 A. 2d 745, 749 (1960).

The hypothetical question asked Dr. Spencer was as follows:

"Doctor, assuming that you have a patient who is gainfully employed and has a history of infrequent epileptic seizures of the grand mal type over a period

of years, takes regular oral medication for his epileptic condition three times daily, assume further that the patient, before suffering an epileptic seizure gets warning of the impending seizure sufficient to allow him to sit down and make adjustments, do you have an opinion, based on reasonable medical probability, whether that patient has a mental or physical disability?"

Counsel for State Farm seasonably objected on the ground that several material facts were not included in the hypothetical question and indicated several of such omitted facts. The trial court, in our opinion, properly sustained the objection.

In the first place, the hypothetical question assumes that the patient had *only* seizures of the grand mal type, whereas the evidence included that he *also* had seizures of the petit mal type. The omission of this fact was clearly material as Nines—in one statement at least—had indicated that in the accident in this case he had suffered a petit mal seizure which came upon him without warning, whereas when he suffered from a grand mal seizure he had had sufficient warning to prepare for the seizure. The evidence in regard to the lack of warning from the petit mal seizure is not present in the hypothetical question. Nor was there any inclusion of the facts in regard to Nines' medical discharge from the Marine Corps with a "Diagnosis, epilepsy" and his award of a pension based on a finding that he was suffering from a 30% disability at the time of his discharge. In our opinion, the omission of these material facts from the hypothetical question, justified the trial court in sustaining the objection to that question.

*Judgment affirmed, the appellants to pay the costs.*