### Valerie JACKSON

v.

### HARTFORD LIFE AND ANNUITY INSURANCE COMPANY

No. CIV. CCB–01–2496.

United States District Court, D. Maryland.

May 15, 2002.

Aaron Robert Caruso, Curtis Perry Abod, Jacobs Abod and Caruso, Rockville, MD, for Plaintiff.

Charles R. Bacharach, Gordon Feinblatt Rothman, Hoffberger and Hollander LLC, Baltimore, MD, for Defendant.

### MEMORANDUM

BLAKE, District Judge.

Now pending before this court is a motion for summary judgment brought by defendant Hartford Life and Annuity Insurance Company ("Hartford"). Plaintiff Valerie Jackson has brought suit against Hartford claiming that it has wrongfully withheld life insurance benefits payable as a result of the death of her fiancé, Edward C. Gray. Hartford claims that because of material misrepresentations made on the application for life insurance, it had the right to rescind the policy and deny benefits. This matter has been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated below, the court will grant defendant's motion.

### Background

On or about October 24, 1998, Ms. Jackson met with Hartford agent Larry Zanin to begin an application for a life insurance policy. Jackson applied for a universal life policy with a death benefit of $150,000.00, along with term riders covering her fiancé Edward Gray, and her daughter, son, and grandson. (Def.'s Mot. Ex. 2.) With regard to the term rider covering Mr. Gray, Jackson initially applied for a 20–year spouse rider with a $100,000 death benefit. (*Id.* at 2.) Because Jackson and Gray were not married, instead of a 20–year spouse rider, Hartford issued a 10–year rider with a $100,000 death benefit. (*Id.,* Ex. 3 at ¶ 5.)

During the October 24 meeting, Jackson did not fill out the application herself, but apparently was asked the questions by Zanin, who filled in the answers on the application form. While Jackson argues in her opposition that Zanin "drafted and completed" the application, (Pl.'s Opp. at 8), the record reflects that Zanin posed the application questions to Jackson, and then transcribed her answers onto the application form. (Def.'s Mot. Ex. 1 at 29, 31–43.) She provided information about herself and her family members who were to be covered by term riders. (*Id.,* Ex. 2.) Pertaining to Gray, she provided information

on his employment history, medical history (including information about injuries sustained in a 1994 automobile accident), his height and weight, and whether he had other life or accidental death insurance. (*Id.*, Ex. 1 at 35, 38, 41–43.) In her deposition, Jackson admitted that Zanin had correctly recorded the information provided to him. (*Id.* at 40–43.) Jackson signed the completed application on October 24, Gray and Jackson's daughter Kwanice signed the application at a later meeting. (*Id.* at 43–44.)

Approximately four months after the policy became effective, on March 22, 1999, Gray tragically was killed by a gunshot wound to the head while driving en route to Kwanice Jackson's home in Southeast D.C.[1] In April 1999, Ms. Jackson made a claim on the policy, seeking benefits in the amount of $100,000. (Def.'s Mot. Ex. 5 at 1.) Hartford then exercised its right to investigate because the claim was filed within two years of the issuing date of the policy. (*Id.*)[2] Through the investigation, Hartford learned that certain facts had been omitted on the insurance application. Apparently,

> Hartford learned that Mr. Gray had been arrested and charged with two counts of forgery and felony theft in 1989.... In addition, Hartford learned that Mr. Gray had pleaded guilty to felony theft charges on June 11, 1996 and was sentenced to fifteen years, suspended. The court records further disclosed that Mr. Gray was placed on probation for three years and was on probation for that crime at the time he signed the application for insurance. In addition, Hartford learned that Mr. Gray had been treated for a gunshot

wound to the head at Washington Hospital Center on January 24, 1998, less than a year before he signed the insurance application.

(*Id.* at 1–2.) Hartford then concluded that the omission of the above information from the insurance application constituted a material misrepresentation of Gray's medical and criminal history. (*Id.* at 2.) As a result, Hartford exercised its right to effect a recission of the insurance policy. (*Id.*) Hartford refused to pay the claim, canceled the policy, and refunded to Jackson all premiums paid for the policy. (*Id.*)

On August 22, 2001, Jackson filed a complaint in this court, alleging that Hartford breached the insurance contract by canceling the policy and failing to pay benefits due. Hartford filed the pending motion for summary judgment on March 12, 2002.

### *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judg-

---

1. Jackson contends that the shooting was a random act by an unknown assailant and was unprovoked by Gray. (Pl.'s Opp. at 3–4.)

2. In Maryland, life insurance policies become "incontestable" after two years from the issuing date. MD. CODE ANN., Insurance, § 16–203.

ment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### *Analysis*

In its motion, Hartford argues, pursuant to MD. CODE ANN., Insurance, § 12–207(b), that it is entitled to rescind the policy and deny benefits because Gray made material misrepresentations on the insurance application, and because it would have not issued the policy had it known the correct facts. Jackson does not dispute that Gray was convicted of felony forgery in 1996 and was on probation when he signed the application, or that Gray was treated for a gunshot wound in 1998. (Pl.'s Opp. at 1–2.) She argues in her opposition, however, that since Gray was never himself posed the questions on the insurance application, but was only asked to sign the completed form, Hartford has either waived its right to rescind the policy or should be estopped from the same. (*Id.* at 2.) Jackson argues further that any misrepresentations con-

tained in the insurance application were not material, and thus are not a proper basis for recission of the insurance contract. (*Id.* at 6.) Finally, based on the testimony of proposed expert witness Dr. Will Johnston, and on Hartford's written underwriting guidelines, Jackson argues that Hartford would have issued the term rider on Gray's life even if it had known about Gray's criminal and medical history. (*Id.* at 2.)

### 1. Waiver and Estoppel

■ Jackson argues that "Zanin's failure to make even perfunctory requests for information from any of the other insureds estops the defendant from rescinding the policy and waives their [sic] right to rescind the policy." (Pl.'s Opp. at 8.) Jackson, based on Zanin's deposition testimony, argues that Zanin "prepared, drafted and completed the application that is now the Defendant's basis for summary judgment" and that she herself "wrote nothing on the application, save her signature on the required line where Zanin had conveniently marked an "X" for her and the other adult proposed insureds." (*Id.*) According to Jackson, when Zanin presented the application to Gray and to Kwanice Jackson for signature, he "wrongly failed to verify, append, or supplement the application by asking Mr. Gray or Kwanice any of the questions that he had asked of Ms. Jackson." (*Id.*) Jackson thus argues that any omissions in the application cannot be relied upon by Hartford because the omissions themselves are the product of its agent's mistake or wrongdoing. According to Jackson, Hartford could only rely on omissions in the application if Jackson and Gray had physically filled out the insurance application. (*Id.*) In this case, Jackson argues, "Zanin was completely and solely responsible for obtaining the information requested on the application and

Mr. Zanin failed miserably in this regard." (*Id.*)

 Jackson's arguments on this point are without merit. Under Maryland law, an applicant for insurance is held to the representations in an application that he or she has signed, even if a third party filled out the application. *Serdenes v. Aetna Life Ins. Co.*, 21 Md.App. 453, 319 A.2d 858, 863 (1974); *see also Shepard v. Keystone Ins. Co.*, 743 F.Supp. 429, 432–33 (D.Md.1990); *Foreman v. Western Reserve Life Assurance Co. of Ohio,* 716 F.Supp. 879, 883 (D.Md.1989). This holds true even if the third party deliberately inserts misleading or false information on the application form. *Id.* If an application contains a false statement, "[i]t is immaterial that it is the agent who inserts false statements about material matters in an application for insurance, because if the assured has the means to ascertain that the application contains false statements, he is charged with the misrepresentations just as if he had actual knowledge of them and was a participant therein." *Id.* (collecting cases).

 It is undisputed that Gray signed the application for insurance. According to the rule stated in *Serdenes*, Gray was attesting to the accuracy of the information contained in the application when he signed it. Only if Gray had not been provided an opportunity to review the application could he avoid the consequences of false representations contained therein. Although Jackson argues that Zanin "merely presented [to Gray] the last page of the application and instructed [him] as

to where to affix [his] signature," (Pl.'s Opp. at 3), there is no contention that Gray did not have the opportunity or means to review the application before he signed it. *See Serdenes,* 319 A.2d at 863.[3]

This conclusion is buttressed by an inspection of the application itself. On the signature page of the application above the space for signature, there is a section titled "Declarations," under which it is written, "[e]ach of the undersigned declares, understands and agrees that: ..." followed by seven numbered sections. (Def.'s Mot. Ex. 2 at 5.) The first declaration states that "[a]ll statements and answers contained in this application and in any other required form(s) are complete and true to the best of each proposed insured's and policyowner's knowledge and belief." (*Id.*) The application thus makes clear that the signatory is vouching for the accuracy of the information contained therein. Moreover, Jackson has not argued, sensibly so, that Gray did not have knowledge of his own criminal and medical history.

### 2. Materiality under Section 12–207(b) of the Maryland Code

Section 12–207(b) of the Maryland Code sets forth the circumstances under which an insurer may avoid a contract for life insurance on the basis of misrepresentations in the insurance application. The section states in relevant part:

(b) *Misrepresentations preventing recovery.*—A misrepresentation, omission, concealment of facts, or incorrect state-

---

**3.** Maryland law does not impose a duty on an insurance agent to investigate or verify the answers to an application's questions. Moreover, the failure to investigate an insurance application does not invoke the doctrine of estoppel. *North American Specialty Ins. Co. v. Savage,* 977 F.Supp. 725, 730 (D.Md.1997) "[U]nless the party against whom the doctrine

has been invoked has been guilty of some unconscientious, inequitable, or fraudulent act of commission or omission, upon which another has relied and been misled to his injury, the doctrine [of estoppel] will not be applied." *Id.* (quoting *Bayshore Indus., Inc. v. Ziats,* 232 Md. 167, 192 A.2d 487, 492 (1963)).

ment does not prevent a recovery under the policy or contract unless:

> (1) the misrepresentation, omission, concealment, or statement is fraudulent or material to the acceptance of the risk or to the hazard that the insurer assumes; or
>
> (2) if the correct facts had been made known to the insurer, as required by the application for the policy or contract or otherwise, the insurer in good faith would not have:
>
>> (i) issued, reinstated, or renewed the policy or contract;
>>
>> (ii) issued the policy or contract in as large an amount or at the same premium or rate; or
>>
>> (iii) provided coverage with respect to the hazard resulting in the loss.

MD. CODE ANN., Insurance, § 12–207(b).[4] Hartford argues that the omissions on the insurance application relating to Gray's criminal and medical history are material, and that it would not have issued the policy had it known the true answers to the application's questions. Because the court finds that certain omissions constituted material misrepresentations and thus judgment may be granted on that ground, there is no need to reach Hartford's argument that it would not have actually issued the policy had it known the true facts.

■■■ "The general rule in this area of law is that a material misrepresentation in the form of an incorrect statement in an application invalidates a policy issued on the basis of such application." *Bryant v. Provident Life and Accident Ins. Co.*, 22

F.Supp.2d 495, 497 (D.Md.1998), *affd.* 634 F.2d 622 (4th Cir.1980) (*quoting Fitzgerald v. Franklin Life Ins. Co.*, 465 F.Supp. 527, 534 (D.Md.1979)). This is true even if the material misrepresentation is made in good faith. *Fitzgerald*, 465 F.Supp. at 534. Because Jackson has conceded that the application was incomplete and did not contain information on Gray's prior gunshot injury and his probationary status, (Pl.'s Opp. at 2), the court concludes that the application contained a misrepresentation and may immediately turn to the question of whether the misrepresentation was material.[5]

■■■ A material misrepresentation is one that may "reasonably have affected the determination of the acceptability of the risk." *North American Specialty Ins. Co. v. Savage*, 977 F.Supp. 725, 728 (D.Md. 1997) (*quoting Nationwide Mut. Ins. Co. v. McBriety*, 246 Md. 738, 230 A.2d 81, 84 (1967)); *Monumental Life Ins. Co. v. Taylor*, 212 Md. 202, 129 A.2d 103, 108 (1957); *see also Metropolitan Life Ins. Co. v. Samis*, 172 Md. 517, 192 A. 335, 340 (1937) ("The question ... [is] whether the misrepresentation of the true facts would reasonably have affected the determination of the acceptability of the risk."); *Commercial Casualty Ins. Co. v. Schmidt*, 166 Md. 562, 171 A. 725, 728 (1934) ("To determine the materiality of the misrepresentations in this application, we think we have only to ask ourselves whether an insurer's decision on acceptance of this risk and the issue of insurance of this kind would reasonably have been influenced by the truth

---

**4.** Section 12–207(b) was formerly codified in substantively the same form at Art. 48A, § 374.

**5.** A court should not find that there has been a misrepresentation where the relevant question on the insurance application is not "reasonably designed to elicit from him the information which he possesses, material to the

risk ...." *Stumpf v. State Farm Mut. Auto. Ins. Co.*, 252 Md. 696, 251 A.2d 362, 367 (1969.) Jackson does not argue that the relevant questions on the insurance application were vague, ambiguous, or not "reasonably designed" to elicit material information which Gray possessed.

....."). An insurer may avoid the policy based on a misrepresentation, because the issuance of an insurance policy based on material misrepresentations "results in the assumption by the insurer of a risk different from that which the applicant led it to suppose it was assuming." *Silberstein v. Massachusetts Mut. Life Ins. Co.*, 189 Md. 182, 55 A.2d 334, 337 (1947).

▆▆▆▆ The materiality of a misrepresentation is typically a question of fact for the jury, and the burden of proof lies with the party attempting to assert the defense. *John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Adams*, 205 Md. 213, 107 A.2d 111, 113 (1954). Nonetheless, where materiality is shown by uncontradicted or clear and convincing evidence, the question may become one of law. *North American Specialty Ins. Co.* 977 F.Supp. at 728 (*citing Peoples Life Ins. Co. v. Jerrell*, 271 Md. 536, 318 A.2d 519, 520 (1974); *see also National Life and Accident Ins. Co. v. Gordon*, 45 Md.App. 139, 411 A.2d 1087, 1088 (1980).

The answers to two specific questions on the insurance application are at issue in this case. First, after asking about a list of specific physical ailments, the application questioned whether a proposed insured "had consulted or been treated or examined by a physician or practitioner for any other reason?" (Def.'s Mot. Ex. 2 at 4.) Second, the application asked whether a proposed insured has "in the past five years been convicted of, or pleaded guilty or no contest to, a felony?" (Def.'s Mot. Ex 2 at 3.) According to Kathlene M. McLaughlin, the senior underwriter who processed and approved Jackson's policy, if Gray had disclosed his 1996 criminal conviction, she would have conducted an investigation and discovered that he was

still on probation. (Def.'s Mot. Ex. 3 at ¶ 12.)

Each question called for a "yes" or "no" answer, and asked for "yes" answers to be elaborated on in space provided at the bottom of the page. These questions were unambiguous and straightforward, *see supra* fn. 5, and Gray committed a misrepresentation when he did not include information on his January 1998 treatment for a gunshot wound, and when he did not include information regarding his 1996 conviction for felony forgery.

With regard to the first misrepresentation about the gunshot wound, however, the court cannot say that it was clearly material. The only evidence proffered relating to the incident are medical records generated during treatment of the wound. According to the medical records, a bullet grazed Gray's head, causing injury to his scalp. (Def.'s Mot. Ex. 8.) While no evidence was submitted to elucidate the circumstances behind the shooting, plaintiff stated in her opposition that

> Mr. Gray's earlier gunshot wound was not related to any criminal activity engaged in by Mr. Gray. It was, in fact, a random, indiscriminate event that took place as Mr. Gray was leaving a restaurant. A lunatic fired a weapon aimlessly and a bullet grazed Mr. Gray's scalp. He was treated and released the same day. He was not at fault in any way and it would be folly to lay blame upon him for such an unfortunate happening.

(Pl.'s Opp. at 4.)

Hartford has not attempted to show that the earlier gunshot wound was anything other than a random accident from which Gray had fully recovered. It is not clear how this information may reasonably have affected the determination of the acceptability of the risk.[6] Moreover, Jackson has

---

**6.** This question was contained in the "Medical History" section of the application, which ap-

proffered a proposed expert witness who testified at deposition that, given common industry practice, information on Gray's prior gunshot wound would not have been material to the issuance of the policy, especially if the shooting had been a random event. (Pl.'s Opp. Ex. 1 at 82.) Considering that Hartford does not claim to have company-specific guidelines on how to evaluate prior episodes of this nature, this testimony itself creates a material dispute of fact over the seriousness of the misrepresentation. The court therefore concludes that Hartford has failed to show through uncontradicted or clear and convincing evidence that the omission of information about Gray's prior shooting was a material misrepresentation.

■ The misrepresentation concerning Gray's 1996 felony conviction, however, is material. From the deposition testimony of the senior underwriter who processed Jackson's life insurance application, and from company guidelines that instruct underwriters on how to treat applicants on probation for felony convictions, it is clear that the withheld information would reasonably have affected the determination of the acceptability of the risk.

According to Ms. McLaughlin, "[i]f I had known about Mr. Gray's 1996 felony conviction, and his probationary status at the time I reviewed the application, I would not have approved the issuance of the $100,000 term rider covering Mr. Gray's life." (Pl.'s Mot. Ex. 3 at ¶ 9.) Although the application did not request information

on whether a proposed insured was on probation, Ms. McLaughlin testified that she would have conducted an investigation and discovered Gray's probationary status if she had known of the 1996 conviction. (Def.'s Mot. Ex. 3 at ¶ 12.) The decision to deny insurance would have been dictated by Hartford's written policy on felonies and probation for felonies, which was adopted on September 28, 1998 (before the date of the application at issue in this case). (*Id.* at ¶¶ 10–11.) Hartford underwriters were to "postpone the risk" for potential insureds who were on probation or parole for the commission of felonious acts. (*Id.*, Ex. A.) Underwriters were also directed to use either the Swiss Re or Transamerica Reinsurance underwriting manuals "as a basis for [the] final underwriting decision." (*Id.*) The Transamerica Reinsurance underwriting manual states that "[i]n general anyone on parole or probation is not insurable until that status is completely released." (*Id.*, Ex. B.) Furthermore, with regard to non-violent crimes, the Transamerica Reinsurance manual states that "[a]lthough so called 'white collar' crime may not involve violence, the other serious aspects of criminal activity are present—a lack of basic moral fiber and a disregard for the laws and mores of society." (*Id.*)

Jackson argues that the misrepresentation is not material because the Transamerica Reinsurance guideline was only to deny coverage "in general" to those who are on probation or parole. (Pl.'s Opp. at

---

peared designed to elicit information on medical conditions that may affect the acceptability of risk. Because the shooting apparently did not cause a medical condition that would affect the risk, the misrepresentation could not have been material on that ground. *See Nationwide Mut. Ins. Co.,* 230 A.2d at 85 ("[T]he failure to disclose consultations with a physician for minor or *temporary* ailments will not avoid a policy.") (emphasis added).

Hartford could possibly have used the information to make inferences about Gray's lifestyle—that he was one prone to being shot at again. However, the questions in the application designed to identify applicants with dangerous lifestyles never approached the topic of accidental shootings or other accidents. The failure of Hartford to ask for such information supports a conclusion that the omission of the information was not material.

7.)[7] This language, however, does not render Gray's misrepresentation immaterial. The insurance company is not required to prove that it would not have issued the policy had it known the true facts, although that may often be the outcome. The test for materiality, instead, turns on whether the information would reasonably have affected the determination of the acceptability of the risk. *Nationwide Mut. Ins. Co.*, 230 A.2d at 84. Because Hartford's presumptive policy was to deny coverage to persons on probation, the fact that Gray was on probation would certainly have affected the decision making related to acceptance of the risk. As the Court of Appeals stated in *Commercial Casualty Ins. Co.*, the question is "whether an insurer's decision on acceptance of this risk and the issue of insurance of this kind would reasonably have been influenced by the truth . . . ." 171 A. at 728. It is uncontradicted in the record that a prudent Hartford underwriter would be influenced by a person's probation status in deciding whether to issue life insurance.

Neither is Jackson's proposed expert helpful to her with respect to this particular misrepresentation. Dr. Johnston did not testify that he had any knowledge of Hartford's, Swiss Re's, or Transamerica Reinsurance's underwriting guidelines.

Therefore, his opinion that Hartford would have issued the policy even with knowledge of Gray's criminal history is of limited relevance, and is insufficient to offset Hartford's evidence to the contrary. (*See* Pl.'s Opp. Ex. 1 at 64–65.)[8]

Finally, although no reported case applying Maryland insurance law has considered a misrepresentation of this nature, courts applying other state laws have found the misrepresentation of one's criminal history to be material in certain circumstances. For instance, in *Simmons v. Conseco Life Ins. Co.*, the insured was found to have made a material misrepresentation by omitting from an insurance application information relating to two prior felony convictions. 170 F.Supp.2d 1215, 1224–25 (M.D.Fla.2001). The *Simmons* court, applying Florida insurance law virtually identical in relevant part to Maryland law, found that the omissions were material misrepresentations because the omitted information would have "put [the insurer] on notice that further inquiry was warranted to adequately gauge the risk of issuing a policy." *Id.*[9]

In conclusion, because Gray made a material misrepresentation with respect to the $100,000 term rider on Jackson's policy, Hartford was within its rights to cancel

---

**7.** Although not cited by Jackson, Hartford's underwriting manual states that the Swiss Re and Transamerica Re guidelines should be used "generally." (Def.'s Mot. Ex. 3, Ex. A.)

**8.** Dr. Johnston testified that the nature of the felony is most relevant, and that because Gray was convicted of a nonviolent felony, the policy should have been issued. Contrary to Dr. Johnston's view, the underwriting guidelines submitted to the court state that violent and nonviolent crimes should be treated equally. (Pl.'s Mot. Ex. 3, Ex. B.)

**9.** In *Russell v. Royal Maccabees Life Ins. Co.*, the Court of Appeals of Arizona, while apparently accepting that the misrepresentation of a criminal history could be material, found that a dispute of fact existed with regard to the intentionality of the misrepresentation. 193 Ariz. 464, 974 P.2d 443, 450 (1999). Under Arizona law, unintentional misrepresentations may not be a sufficient basis for an insurer to cancel a life insurance policy. *Id.* Also, in *Lewis v. John Hancock Mut. Life Ins. Co.*, the court found that, because the insurer's underwriting guidelines called for a "case by case" consideration of each application, a genuine issue of fact existed regarding whether the misrepresentation of criminal history was material. 443 F.Supp. 217, 218–19 (D.Conn.1977). But *cf., La Teano v. Hartford Life Ins. Co.*, No. CV 980580409S, 2000 WL 966371 (Conn.Super.Ct. June 23, 2000).

the policy and deny benefits to Jackson. While the court regrets any hardship that may be caused to Jackson by way of this arguably harsh result, the misrepresentations subscribed to by Gray provide a sufficient basis under Maryland law for Hartford's decision to rescind.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. defendant Hartford Life and Annuity Insurance Company's motion for summary judgment is **GRANTED**;

2. copies of this Order and the accompanying Memorandum shall be mailed counsel of record; and

3. the clerk of the court shall **CLOSE** this case.