## Shafer, Appellant, v. John Hancock Mutual Life Insurance Company.

Argued November 14, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*Henry T. Reath*, with him *Duane, Morris & Heckscher*, for appellants.

*John J. Dautrich*, with him *White and Williams*, for appellee.

OPINION BY MR. JUSTICE EAGEN, March 19, 1963:

In this action of assumpsit, the trustees of an insurance trust seek recovery of the proceeds of a life insurance policy issued by the defendant company on the life of Walter S. Shiffer, deceased. A jury trial resulted in a verdict for the defendant. The plaintiffs alleging prejudicial error requested a new trial. The court en banc denied the motion, concluding that the defendant was entitled to judgment as a matter of law and that the reasons assigned in support of a new trial were academic. Plaintiffs appeal.

The policy bore an issue date of December 31, 1955, although it was not delivered until April 1956. The

proceeds were payable on the death of the insured to specific trustees for the benefit of the insured's family. The application form consisted of Part A—"Statements to Company's Agent" and Part B—"Statements to Medical Examiner." Two Part B's were executed, one on December 30, 1955, and the other on January 24, 1956, because two separate medical examinations were conducted due to the amount of the policy. Each Part B was signed by the insured, following a certification that, *"The foregoing statements and answers are complete, true and correctly recorded."*

Shiffer was killed as a result of an automobile accident on May 23, 1957.[1] The insurance company refused to pay the proceeds due under the terms of the policy on the ground that the insured had given false and fraudulent answers in the application.[2]

In the two Part B's of the application referred to hereinbefore, a number of identical questions were asked of Shiffer concerning his prior medical history and state of health. These included the following: "had blood spitting? . . . ever had or been told you had increased blood pressure? . . . ever had x-rays? . . . ever had electrocardiograms? . . . ever had blood examinations or other studies? . . . consulted, been treated or examined by any physician or practitioner within five years? . . . attended or been treated, or confined in any hospital, clinic, sanitorium or similar institution during the past five years?" The answer to each question was "No" except in reference to x-rays, it was stated "Yes. Routine factory chest x-ray. Negative," and to the inquiry concerning blood studies, it was stated, "Yes. Negative. Donor."

At trial, hospital records, doctors' records and admissions in the pleadings established the following

---

[1] The policy contained the standard two-year contestable clause.

[2] Payment or return of the amount of premiums paid was offered and refused.

facts: (1) Shiffer was hospitalized for the following periods: August 12 to 18, 1953;[3] February 4 to 8, 1954; February 10 to 14, 1954 and February 15 to 20, 1954; (2) Shiffer was examined and treated by physicians on numerous occasions between the dates January 17, 1953 and January 7, 1956; (3) Medical examinations indicated blood pressure elevated on occasions both as to systolic and diastolic pressures, ranging up to 190/110 over a period from August 12, 1953, to June 3, 1955; (4) During aforesaid periods of hospitalization electrocardiograms were taken on five distinct occasions; at least one showed the presence of ventricular premature contractions and evidence of auricular fibrillation (this last condition was concluded to be of a temporary nature), others were essentially normal; (5) Fourteen x-rays were taken between January 17, 1953, and March 27, 1954. Oral uncontradicted testimony by medical witnesses called both by the plaintiffs and the defendant indicated that Shiffer had been told by doctors that his blood pressure was "elevated."

In answer to the above evidence, the plaintiffs point to other testimony in the record indicating that during the period involved the insured was a vigorous, hard working individual, who apparently enjoyed excellent health; that during the period from 1953 to the date of his death, Shiffer made frequent visits to physicians for routine checkups and not for treatment of any serious illness; that these examinations indicated Shiffer was not suffering from any organic disease; that the physicians told him that his blood pressure was only "slightly elevated" due to nervous tension; that his hospitalization in one instance was instigated by a fainting spell and that during this examination, some electrocardiograms indicated negative results

---

[3] This hospitalization followed a fainting spell and the hospital records contained the following notation. "Patient felt abdominal pain radiating into both jaws."

leading to the diagnosis that his trouble was elevated blood pressure due to tension and overwork; that the other hospitalizations involved were for what was first considered to be lung cancer but that clinical studies, blood studies, electrocardiograms, x-rays, etc., established that his blood spitting and discomfort were due to a fractured right clavicle; that at no time was the insured informed that heart disease or lung cancer were suspected; that the insured authorized the insurer in writing to gain access to and examine medical or hospital records available. On the basis of this testimony, it is strenuously urged that the question of whether or not the answers given by the insured were fraudulently made with an intent to deceive the company was for the jury's determination. To this position, we cannot subscribe.

In order to avoid the policy sued upon, the burden was upon the defendant to establish that the statements made by the insured in the application were material to the risk and were falsely and fraudulently made by the insured: *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa. 547, 186 A. 133 (1936). If the statements in fact were false and the insured knew that they were false when he made them, this constituted fraud, since a statement known to be false when it is made is presumptively fraudulent: *Kizirian v. United Benefit Life Ins. Co.*, 383 Pa. 515, 119 A. 2d 47 (1956). If such falsity and the requisite bad faith affirmatively appear from (a) competent and uncontradicted documentary evidence, such as hospital records, admissions in the pleadings or proofs of death or (b) the uncontradicted testimony of plaintiff's own witnesses, a verdict may be directed for the insurer, *Kizirian v. United Benefit Life Ins. Co.*, supra. Inquiries in applications for life insurance as to prior medical attendance and hospitalization are material to the risk and fraudulent answers thereto must permit

the insurer to avoid the policy, not only because of a failure to report the exact nature of the previous illness, but also because of a failure to furnish information from which the insurer could protect itself through further investigations. *Reeder v. Metropolitan Life Ins. Co.*, 340 Pa. 503, 17 A. 2d 879 (1941) ; *Prevete v. Metropolitan Life Ins. Co.*, 343 Pa. 365, 22 A. 2d 691 (1941).

In the instant case, the falsity of the answers given by the insured was established beyond question by unimpeached documentary evidence and in part by plaintiffs' own witnesses. But argue the appellants, this does not conclusively establish that the insured knew they were false or intended thereby to deceive and defraud the company. It is speculated that the false statements were made inadvertently and unintentionally. As stated in *Derr v. Mutual Life Ins. Co.*, 351 Pa. 554, 559, 41 A. 2d 542 (1945), " '. . . "Where it affirmatively appears from sufficient documentary evidence, that the policy was issued in reliance on false and fraudulent statements, made by or on behalf of the insured, as where false answers are shown to have been given by the insured *under such circumstances that he must have been aware of their falsity,* the court may direct a verdict or enter judgment for the insurer." ' " Accord, *Freedman v. Mutual Life Ins. Co.*, 342 Pa. 404, 21 A. 2d 81 (1941). How can it now be reasonably asserted that the insured through inadvertence forgot or innocently overlooked his frequent examinations, consultations and treatments by physicians within a relatively short period of time before making and executing the application for insurance? How could he have innocently overlooked, or considered of such little significance that it should not be disclosed, his hospitalization, the taking of numerous x-rays and electrocardiograms? To ask these questions is to answer them. Even if it be conceded that the insured had no indica-

tion of any serious illness, he was bound to know and to remember substantially all of the medical treatment, hospitalization, x-rays and electrocardiogram. *Anastasio v. Metropolitan Life Ins. Co.,* 149 Pa. Superior Ct. 414, 27 A. 2d 510 (1942); *Reeder v. Metropolitan Life Ins. Co.,* supra. In this connection, it is interesting to note that he did remember and disclose routine chest x-rays made at the factory and blood studies made incidental to blood donoring.

It is argued that the company had the right and opportunity to make an adequate investigation and ascertain the prior health of the insured before the issuance of the policy. No such duty was imposed under the facts presented. See, *Kizirian v. United Benefit Life Ins. Co.,* supra. Further, his statements, upon the truth of which the company had every right to rely, indicated no such investigation was necessary.

Finally, the fact that Shiffer died from accidental injuries totally unrelated to any prior illness or condition existing when the policy was issued is not controlling. The materiality of the statements or answers involved went to the risk assumed, not to the loss incurred. The insurer was led into assuming the risk involved by virtue of his fraudulent answers. It is of no consequence that the death ensued from a cause unconnected with the false representations. See, *Hartmen v. Keystone Ins. Co.,* 21 Pa. 466 (1853); *Murphy v. Prudential Ins. Co. of America,* 205 Pa. 444, 55 A. 19 (1903); *Carson v. Metropolitan Life Ins. Co.,* 1 Pa. Superior Ct. 572 (1896).

Judgment affirmed.

Mr. Justice MUSMANNO dissents.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I disagree with the majority's view that appellee-insurer was entitled to a directed verdict under the

facts of this case. Since the leading case of *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa. 547, 186 Atl. 133 (1936), we have held that binding instructions on the question of bad faith are not warranted by a mere showing that a false answer was knowingly made. See, e.g., *Allstate Insurance Co. v. Stinger*, 400 Pa. 533, 163 A. 2d 74 (1960). In addition, it is required that there also be an intent to deceive on the part of the insured, i.e., an attempt through false answers to secure insurance which would not otherwise be obtainable at the same rates, or at all. In *Evans* itself, we upheld the denial of a motion for judgment n.o.v. although it was admitted that the insured knowingly concealed that he was suffering from a dislocated vertebra, a condition which eventually caused his death. We stated that the jury could reasonably conclude that the condition was too trivial to report. In *Adams v. Metropolitan Life Insurance Co.*, 322 Pa. 564, 186 Atl. 144 (1936), we upheld the denial of a motion for judgment n.o.v. although the insured knowingly failed to reveal that she had consulted a doctor fifteen times within three months prior to the application. Such evidence was not inconsistent with a finding of a lack of an intention to deceive.

It is true that bad faith will be declared as a matter of law where the insured conceals that he is suffering from a serious illness. See *Indovina v. Metropolitan Life Insurance Co.*, 334 Pa. 167, 5 A. 2d 556 (1939).[1] In our case, however, there is no evidence that the insured was suffering from a serious illness which he would seek to conceal. On the contrary, as the majority points out, there was evidence that "the insured was a vigorous, hard-working individual, who apparently enjoyed excellent health." Under such circum-

---

[1] In *Indovina*, the insured concealed that he was suffering from severe anemia.

stances, the question of bad faith was clearly for the jury.

I would, therefore, reverse the granting of a directed verdict and remand this case to the court below with direction to rule on appellants' motion for a new trial.