**METROPOLITAN LIFE INSURANCE COMPANY, Appellant,**

v.

**Annabelle JOHNSON, Appellee.**

**No. 8784.**

District of Columbia Court of Appeals.

Argued April 10, 1975.

Decided Sept. 30, 1976.

Reid C. Tait, Washington, D. C., with whom James Gregg, Washington, D. C., entered an appearance, for appellant.

Wiley A. Branton, Washington, D. C., with whom Robin Alexander Smith, Washington, D. C., was on the brief, for appellee.

Before FICKLING, KERN and HARRIS, Associate Judges.

HARRIS, Associate Judge:

A jury found in favor of Mrs. Annabelle Johnson (appellee) on her claim for $10,-000 under a policy issued by Metropolitan Life Insurance Company (Metropolitan) on the life of her late husband. Metropolitan made a motion for a directed verdict at the close of the evidence, which the trial court denied. A motion for a judgment notwithstanding the verdict also was denied. Metropolitan contends that Mrs. Johnson was precluded by D.C.Code 1973, § 35–414, from recovering under the policy.[1] We agree and reverse.

I

On October 7, 1970, Joseph Heller, an agent for Metropolitan, went to appellee's home to discuss the possible sale of an insurance, policy. Appellee and her husband, Lawrence Johnson, had dealt previously with Heller in his professional capacity; their business relationship dated back to 1963 or 1964 when Heller first sold the Johnsons a hospitalization policy.

Heller discussed insurance with appellee and her daughter; Mr. Johnson was not

1. The statute provides:

The falsity of a statement in the application for any policy of insurance shall not bar the right to recovery thereunder unless such false statement was made with intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the company.

then present. Heller and appellee agreed on a modified hospitalization plan and a $10,000 policy on Mr. Johnson's life. Mrs. Johnson and her daughter both testified that Heller then completed the application for the life insurance policy without asking them any of the questions listed thereon. Both stated that Mr. Johnson returned home shortly thereafter and was presented with the application for his signature, without being asked any of the questions contained in the document. As they described the incident, Mr. Johnson signed the application and returned it to Heller without reading it.[2] Conversely, Heller testified that he indeed posed the requisite questions to both the decedent and appellee, and obtained from them the responses set forth on the application. While the application reflected certain information, as to ailments experienced by other family members, it revealed no information as to adverse medical conditions, treatment, or other deficiencies in Mr. Johnson's health.

The application contains the following pertinent questions:

3. Do you . . . have any deformity, loss or impairment of limb, or any known impairment of sight or hearing?

&ast; &ast; &ast; &ast; &ast; &ast;

5. Have you . . . ever been advised by a physician . . . to modify or restrict your eating, drinking, or living habits because of any health conditions?

6. Have you . . . received treatment, attention, or advice from any physician . . . for, or been told by any physician . . . that you . . . had:

(a) High blood pressure, chest pain or heart trouble?

&ast; &ast; &ast; &ast; &ast; &ast;

(d) Epilepsy paralysis, dizziness or any mental or nervous disorder?

The answer to each of these questions, as recorded on the application by Heller, was "No". Additionally, the application did not list, contrary to the dictates of its terms, every disease, ailment, or injury, not otherwise disclosed on the form, for which the applicant—Mr. Johnson—had received any treatment, examination, or advice by a medical practitioner or establishment during the prior five years. A policy was issued on the life of Mr. Johnson on November 17, 1970, based on the information contained in the application.

In contradistinction to the enviable medical history as reflected in the disputed form several doctors gave uncontroverted testimony that at the time of the application, and for some time prior and subsequent thereto, Mr. Johnson had been afflicted with arterial difficulties which were manifested in various physical problems. He had experienced hypertension for at least two years prior to the request for the insurance, and he had suffered from nighttime restlessness, numbness of his right thumb, and warm feelings in his right leg. He also had frequent headaches which were attributed to spasm of the cerebral blood vessels. For these ailments, a physician had prescribed drugs to improve the cerebral blood flow and placed Mr. Johnson on a low-calorie diet. Mr. Johnson had undergone examination and treatment for at least three episodes of dizziness, and he suffered from nystagmus, here a horizontal oscillation of the eyeball, often associated with dizziness and suggesting a problem in an area of the brain supplied with blood by the carotid artery. These conditions had manifested themselves at least as early as the first months of 1968. There is no indication that they were arrested significantly before the date of the signing of the application.

---

2. When asked if the decedent read the application at the time he signed it, his daughter testified: "My father never read anything like that."

In April 1970 (only six months before the application was signed), Mr. Johnson lost his vision in his left eye, due to a clotting resulting from a carotid artery thrombosis. At that time a physician told him that his cholesterol level remained high, suggested supplementary dietary restrictions, and prescribed additional medication. In diagnostic terms, the medical testimony was that Mr. Johnson had suffered and was suffering from a "cerebral thrombosis" and "cerebral vascular accidents".[3]

Metropolitan introduced unrefuted evidence at trial that the omitted data was material to the company's determination of whether to accept the risk of insuring the life of Mr. Johnson. Dr. Gray, Metropolitan's Associate Medical Director in the Underwriting and Claims Division, stated that had the company received such information, it would have contacted each examining physician (Mr. Johnson had consulted several) for full medical details. He explained that if, as appears, Mr. Johnson had experienced, more than one cerebral vascular accident, Metropolitan's standards would have compelled rejection of the risk. Dr. Gray testified that if the medical history as attested to by the physicians in court were correct, Metropolitan would not have issued the policy on Mr. Johnson's life.

On July 5, 1971, Mr. Johnson died as a result of another cerebral thrombosis. Upon appellee's request for payment of the face amount of the policy pursuant to its terms, Metropolitan declined the remittance on the dual grounds that (1) the application, as the basis of the insurance contract, contained significant, material misstatements and omissions contrary to Mr. Johnson's signed attestation as to the completeness and truth of the statements therein, and (2) independently of the terms of the contract, § 35–414 of the Code sanctioned the company's refusal of payment. Faced with the company's determination not to pay her, Mrs. Johnson brought suit in Superior Court for the $10,000.

## II

■ Metropolitan contends that in light of the provisions of § 35–414, it was error for the court to deny its motion for a directed verdict at the close of the evidence. The courts of this jurisdiction have consistently construed that statute as meaning that "proof that an application for insurance contains a false statement which materially affects the acceptance of the risk or hazard assumed by the insurer is sufficient to defeat a claim under the policy." *Hill v. Prudential Ins. Co.,* D.C.App., 315 A.2d 146, 148 (1974). As the circuit court explained in *Jannenga v. Nationwide Life Ins. Co.,* 109 U.S.App.D.C. 385, 388, 288 F.2d 169, 172 (1961): "The test of materiality is whether the representation would reasonably influence the insurer's decision as to whether it should insure the applicant." Here there was undisputed evidence that the misrepresentations concerning the decedent's health and medical history would have been material to Metropolitan's decision to undertake the risk of insuring his life. Indeed the uncontradicted testimony of Dr. Gray was that had the company known of Mr. Johnson's cerebral vascular problems, his application would have been rejected. Given the extent and seriousness of the disputed misrepresentations, such a conclusion is wholly reasonable. *See Haubner v. Aetna Life Ins. Co.,* D.C.App., 256 A.2d 414, 416 (1969). Without more, the evidence adduced by Metropolitan would be sufficient to raise the statutory bar to recovery.[4] *See Hill v. Prudential Ins. Co., supra.*

---

3. Appellee and her daughter testified that they had no knowledge that Mr. Johnson had suffered any of these ailments or had received any of the medical treatment described by the expert witnesses.

4. It has been held that where the evidence so warrants, the necessary materiality may be found as a matter of law. *Kavakos v. Equitable Life Assurance Society,* 66 App.D.C. 380, 88 F.2d 762 (1936). *See Haubner v. Aetna Life Ins. Co., supra,* at 416; *see also Hill v. Prudential Ins. Co., supra,* at 148.

■ Appellee nevertheless argues that regardless of the materiality of the misrepresentations, Metropolitan was estopped to rely on the statutory defense. It is true that the provisions of § 35–414 are not to be applied in a vacuum, and that, under appropriate circumstances, the principles of equitable estoppel developed in traditional contract law may preclude the statutory defense of misstatement. *See, e. g., Blair v. Prudential Ins. Co.*, 153 U.S.App.D.C. 281, 472 F.2d 1356 (1972). The trial court applied such principles in denying appellant's motion for judgment notwithstanding the verdict, on the grounds that the Johnsons had been in a position of complete reliance on Metropolitan's agent in the formation of the insurance contract. Accordingly, we must consider whether the circumstances were such as to give rise to an equitable displacement of the defense provided by § 35–414. We conclude that they were not.

■ Taking the evidence and the reasonable inferences therefrom in the light most favorable to appellee [*see Seganish v. District of Columbia Safeway Stores, Inc.*, 132 U.S.App.D.C. 117, 118, 406 F.2d 653, 654 (1968)], the record reveals that the agent Heller filled in the inaccurate responses to the questions on the application form when the decedent was not present and without making any inquiries as to the insured's health either to him or to Mrs. Johnson. However, it is undisputed that Mr. Johnson signed the application, apparently without reading it, and that he later received a copy of the completed form (with the resultant policy) which remained in his possession until his death.

It is the law of this jurisdiction that an insured has a duty to read an application which he signs (or, if necessary, to have it read to him) and to report any misrepresentations or omissions to the insurer. He is held to know the contents of his application and is bound thereby, regardless of whether he has actual knowledge of such

at the time he signs the form. *Hill v. Prudential Ins. Co., supra. See New York Life Ins. Co. v. Fletcher*, 117 U.S. 519, 6 S. Ct. 837, 29 L.Ed. 934 (1886); *Stumpf v. State Farm Mutual Auto. Ins. Co.*, 252 Md. 696, 251 A.2d 362 (1969); *Fierro v. Foundation Reserve Ins. Co.*, 81 N.M. 225, 465 P.2d 282 (1970). In short, the insured, is obligated to exercise the ordinary care that is required in every other business transaction. *See* 17 J. Appleman, Insurance Law & Practice, § 9405 (1945). Such requirements rest upon the sound policy objective of avoiding the mischief and fraud which would be possible under a rule permitting applicants for insurance to escape responsibility for false or incomplete information merely by claiming that they had not read the answers set forth on their applications. To relieve the insured of any responsibility for the accuracy of the data upon which the insurer must decide whether to undertake the risk would be manifestly unfair and would introduce an undesirable degree of uncertainty in such transactions. *See New York Life Ins. Co. v. Fletcher, supra*, 117 U.S. at 529, 6 S.Ct. 837.

In *Hill v. Prudential Ins. Co., supra*, a case similar to the one at bar, the insured signed an application for credit life insurance in connection with the financing of a car. It stated falsely that he had not been under the care of a doctor for cancer in the preceding three months. The application was filled out by a car salesman, and the insured and his wife (the appellant in that case) signed the application without reading it. The insured died of cancer several months later, and the insurer refused payment of the widow's claim on the basis that the application contained material misstatements. The trial court directed a verdict for the insurer. We affirmed, reasoning as we do here that:

Such testimony is insufficient as a matter of law to create a question of fact for the jury, for it has long been held that an insured has a duty to read an

application for insurance which he signs and that he is bound by the statements contained therein. [*Id.* at 148.]

We recognize that an exception to this general rule may be warranted when its application would produce a harsh or inequitable result. Appellee places heavy reliance on *Blair v. Prudential Ins. Co., supra,* in which an insured signed an application for life insurance in blank and then orally gave full and correct answers to questions on the form as they were propounded by the agent. The agent, however, without the insured's knowledge, recorded material misstatements and failed to record material information on the form. After completing the form, the agent did not show it to the insured or ask him to read it. The federal court of appeals for this circuit held that under those circumstances, the doctrine of equitable estoppel should be invoked to excuse the insured's failure to read the application.

The instant case does not come within the type of exception acknowledged in *Blair.*[5] There, the applicant provided the insurance agent with full and truthful information about his health. The applicant thus had good reason to believe that the information furnished had been transcribed accurately by the agent. The decedent in our case, on the other hand, provided the agent with no information regarding his health. Moreover, there was no allegation or evidence either that the agent was aware of the decedent's poor physical condition[6] or that Mr. Johnson was under the impression that the agent was so informed. The decedent, therefore, had no reason to believe that his application disclosed correct information about his health or to rely upon the agent to apprise the insurer of the facts.

■ The circumstances before us do not warrant the creation of another exception to the rule binding an insured to the false statements contained in his application. Appellee stresses that the decedent had only a fifth grade education. He was not illiterate, however, and there is no indication that his wife or daughter—who were present—could not have helped him to understand the relatively simple and straightforward questions on the application. Appellees stresses that the Johnson family had known the agent since 1963 or 1964 and that they had great faith in him. However, there was no evidence that the agent exploited this relationship by deliberately recording false information or by inducing or coercing the decedent in any way to sign the form without reading it or without dis-

5. The holding in *Blair*—that when an applicant gives correct oral answers which are incorrectly recorded by an authorized agent, the insurer cannot rely upon the falsity of such answers to avoid liability under the policy—is in accordance with the weight of modern authority. *See, e. g., Oberg v. John Hancock Mutual Life Ins. Co.,* 114 Ill.App.2d 152, 251 N.E.2d 918, 923 (1969); *John Hancock Mutual Life Ins. Co. v. Schwarzer,* 354 Mass. 327, 237 N.E.2d 50, 51–52 (1968); *Schneider v. Washington Nat'l Ins. Co.,* 200 Kan. 380, 437 P.2d 798, 810–12 (1968); *Middlebrook v. Banker's Life & Cas. Co.,* 126 Vt. 432, 234 A.2d 346, 348 (1967).

6. If there were evidence from which a jury reasonably could find that an agent had actual knowledge that the statements he recorded in the application were false, we would rule otherwise, since under those circumstances, the jury properly could render a verdict estopping appellant from defending based upon the falsity of the responses. *See Oberg v. John Hancock Mutual Life Ins. Co., supra;* 17 J. Appleman Insurance Law & Practice, § 9401 (1945).

Appellee offers the explanation that the agent filled out the form as he did because at the time he contemplated that the policy on the decedent's life would be a rider to a liberally underwritten group hospitalization policy for which the insurer would not have required any medical information on the insured. Appellee does not allege, and there is no evidence that the decedent knew, that there was a possibility of a group policy and thus failed to read the application because he assumed or was told that his medical history would be of no concern to appellant.

**990**

closing pertinent information about his health. In the absence of any such fraud or duress on the part of the agent or other extenuating circumstances, an insured is not relieved of his ˙obligation to examine the contents of his application and to correct any errors or omissions. *See All American Life & Casualty Co. v. Saunders,* 125 Ga.App. 7, 186 S.E.2d 328, 331 (1971). *Compare Smith v. Republic National Life Ins. Co.,* 107 Ariz. 112, 483 P.2d 527, 531–32 (1971) (en banc) (fraud by agent); *National Life & Accident Ins. Co. v. Allen,* 285 Ala. 551, 234 So.2d 567, 569–70 (1970) (applicant was legally blind); *Prudential Ins. Co. v. Torres,* 449 S.W.2d 335, 339 (Tex.Civ.App.1969) (applicant could not read English).

The decedent realized or should have realized that the state of his health would be of vital concern to Metropolitan in determining whether to issue a policy on his life. All of the questions regarding his health and the false responses thereto are on the page on which he affixed his signature. Sometime later, the policy was returned·to him with a copy of the application attached thereto. While the decedent clearly did not lack the opportunity or the means to ascertain that the application contained false statements, he failed to disclose information plainly solicited. We hold, therefore, that he was guilty of inexcusable negligence in failing to become aware of the responses in the application, and that the imposition of the general rule charging him with knowledge of all that a reading would have revealed is appropriate here. *See Gooch v. Motors Ins. Co.,* 312 S.W.2d 605, 609 (Mo.App.1958). *Cf. Paterson v. Reeves,* 113 U.S.App.D.C. 74, 75, 304 F.2d 950, 951 (1962). Accordingly we reverse, and direct the entry of judgment for Metropolitan.

*Reversed.*