Ivory JONES et al., Appellants,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA et al., Appellees.

No. 11283.

District of Columbia Court of Appeals.

Argued March 16, 1977.

Decided June 21, 1978.

---

5. *Edwards v. United States,* D.C.App., 379 A.2d 976 (1977).

Norman H. Heller, Wheaton, Md., for appellants.

Charles H. Fleischer, Washington, D. C., with whom Richard S. T. Marsh, Washington, D. C., was on the brief, for appellees.

Before KERN, GALLAGHER, and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Ivory Jones filed an action for himself and the children of his deceased daughter Janis Jones (hereinafter "the insured," as four of the five appellants have the surname Jones) as beneficiaries of an insurance policy issued on her life. They appeal from a judgment notwithstanding the verdict which was granted in favor of The Prudential Insurance Company of America (Prudential). We affirm.

I

On March 28, 1973, the insured applied to Prudential for a life insurance policy. The application form included the following question:

12. Have you . . . ever:
c. used barbiturates, heroin, opiates, or other narcotics except as prescribed by a physician . . .?

She answered "No."

The policy later lapsed due to nonpayment of premiums. On August 7, 1974, the insured applied for reinstatement of the policy. The reinstatement application contained the following inquiry:

14. Has the Insured . . . ever:
c. used narcotics or sedatives habitually or been treated for the drug habit . . .?

The answer given was "No."

On October 25, 1974, the insured died of a gunshot wound, apparently a victim of a drug-related homicide. At the time of her death she was insured under the Prudential policy. Two other people also died in the affray. A police detective who investigated the incident found seven bags of heroin on the body of one victim. Hypodermic needles and syringes were found in the insured's purse and others were found scattered about the premises where the homicides occurred. The Deputy Medical Examiner who performed the autopsy on the insured's body described the external and internal signs of drug use which it bore. These included needle marks containing foreign material (which came from insanitary injections), subcutaneous hemorrhaging, enlarged lymph nodes (especially around the liver), foreign material in the lungs, and changes in the liver. A toxicological report indicated that her body contained traces of morphine, quinine, and Preludin (also known as phenmetrazine or "Bam"). A toxicological report on one of the other persons killed in the affray, Judowne Thomas, was admitted into evidence. It stated that her body contained traces of morphine, quinine, methadone, and phenmetrazine. On the basis of the autopsy findings, the toxicological report, and the cir-

cumstances surrounding the insured's death, the Deputy Medical Examiner concluded that she had been addicted to narcotics for at least three months prior to her death.

The Deputy Medical Examiner also testified generally regarding the medical problems associated with chronic intravenous heroin use. These include congestion and pulmonary edema, multiple infections, damage to various organs, including the brain, heart, lungs, and kidneys, and the risk of overdosage.

Prudential introduced records of three hospitalizations of the insured for childbirths in March 1971, March 1972, and November 1973. The records for the March 1971 stay described her as a heroin addict. Dr. Reing, who treated her during the March 1972 hospitalization, testified that the statement on her hospital record for that occasion that "Patient has a [history] of heroin intake" could only be his recordation of the insured's own statement, and that a second statement "Patient is a heroin addict" must have had the same origin. The records of the 1973 hospital stay also referred to her drug addiction.

Additionally Prudential introduced the insured's records from the Narcotics Treatment Administration (NTA). An August 12, 1974, entry which was based on her counselor's notes indicated that she had "A 2 yr. addiction habit." The notes also indicated that she was undergoing a course of treatment for her addiction.

The insured's mother testified that she had never seen her daughter use drugs at home. The insured had never been arrested for drug use. Appellant Ivory Jones, her father, denied knowing anything about Judowne Thomas' alleged drug habit. He did, however, state that she had been a close friend of his daughter. The insured's mother testified that none of her daughter's children had suffered from narcotic addiction. The testimony of Dr. Reing indicated that three-fourths of the children born to heroin-using mothers show symptoms of addiction. However, none of the insured's children underwent examination which would have focused on that problem.

One of Prudential's underwriting consultants testified that had the company known of the insured's history of heroin use and addiction, it would not have issued a policy to her. Prudential's underwriting rules precluded the issuance of a life insurance policy to any applicant who had used heroin within two years prior to the date of application. Although the company could have had the insured examined medically, nothing on the application, including her medical history as represented, suggested that an examination was necessary.

Prudential asserted that all policy benefits were barred under D.C.Code 1973, § 35–414. That section provides:

> The falsity of a statement in the application for any policy of insurance shall not bar the right to recovery thereunder unless such false statement was made with intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the company.

The jury returned a verdict for appellants, and also answered several special interrogatories which had been propounded to it by the trial court. The jury found that the insured's assertion in the original application that she had never used narcotics was false. However, it also found her denial in the reinstatement application of habitual use to be true. It further found that the misstatement in the original application was not made with the intent to deceive Prudential and was not material to the risk accepted by Prudential. The trial court granted Prudential's motion for judgment notwithstanding the verdict, and conditionally granted its alternative motion for a new trial contingent upon a reversal of the judgment n. o. v. on appeal.[1] The trial court found the jury's conclusion that the

---

1. The propriety and desirability of such an alternative ruling is well settled. *See* Super.Ct. Civ.R. 50(c); *Montgomery Ward & Co. v. Dun-* *can,* 311 U.S. 243, 251–54, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

insured's denial of habitual use was not false to be contrary to the overwhelming weight of the evidence, and concluded that no reasonable juror could have decided that the insured's denial of habitual use was true. Further, it found that such a misrepresentation was material as a matter of law to Prudential's acceptance of the risk.

## II

Appellants contend that a misrepresentation in an application for life insurance bars recovery as a matter of law only when the misrepresentation bears a direct relationship to the ultimate cause of death. We disagree.

■ Initially, we note that narcotics addicts often become involved in crime and violence, resulting in injury to themselves and others. *See* 21 U.S.C. § 1101(a) (Supp. IV 1974); [2] *Gorham v. United States*, D.C. App., 339 A.2d 401, 410–11 (1975); *People v. Broadie*, 37 N.Y.2d 100, 113, 371 N.Y.S.2d 471, 477, 332 N.E.2d 338, 343, *cert. denied*, 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975). The record indicates that the shootings were drug-related. Although there is no basis for concluding that the insured's death was totally removed from her use of drugs, it is not necessary for us to reach that issue on this appeal. We are in agreement with those courts which, in interpreting statutes similar to § 35–414 of our Code, have held that where the misrepresentation would affect the company's acceptance of the risk (or where the misrepresentation was made with intent to deceive), there need be no causal relationship between the misrepresented matter and the insured's death. *See, e. g., Torbensen v. Family Life Insurance Co.*, 163 Cal.App.2d 401, 329 P.2d 596 (1958); *Campbell v. Prudential Insurance Co. of America*, 15 Ill.2d 308, 155 N.E.2d 9, 11 (1958); *Greene v. United Mutual Life Insurance Co.*, 38 Misc.2d 728, 238 N.Y.S.2d 809, 813 (Sup.Ct.1963), *aff'd mem.*,

23 A.D.2d 720, 258 N.Y.S.2d 323 (1965) ("It does not matter in determining materiality, absent a statutory pronouncement declaring otherwise, that no causal relation existed between the loss or death and the misrepresented condition."); *Shafer v. John Hancock Life Insurance Co.*, 410 Pa. 394, 399, 189 A.2d 234, 237 (1963). As stated by the *Shafer* court:

> The materiality of the statements or answers involved went to the risk assumed, not to the loss incurred. The insurer was led into assuming the risk involved by virtue of his fraudulent answers. It is of no consequence that the death ensued from a cause unconnected with the false representations. [189 A.2d at 237 (citation omitted).]

Our ruling today is in accord with the majority view that no such connection need exist. *See, e. g.*, 7 R. A. Anderson, Couch on Insurance § 37.110 (2d ed. 1961); Annot., 148 A.L.R. 912, 913 (1944); 43 Am.Jur.2d *Insurance* §§ 782–83 (1969). Further, it is wholly consistent with the language of § 35–414.

In *Jannenga v. Nationwide Life Insurance Co.*, 109 U.S.App.D.C. 385, 288 F.2d 169 (1961), the circuit court implicitly rejected a contention identical to appellants'. In that case, recovery was denied to a beneficiary of a policy on the life of his infant daughter for his failure to have disclosed the existence of additional applications for insurance on the life of the insured. The court articulated the test of materiality as whether the representation reasonably could be expected to influence the insurer's decision to approve the application. *Id.*, at 388, 288 F.2d at 172. The court did not find it necessary to discuss the cause of the infant's death, thereby implying that a causal relationship between the manner of death and the original misrepresentation was not relevant to a finding of materiality.

2. In enacting the Drug Abuse Office and Treatment Act of 1972, Congress expressly stated in 21 U.S.C. § 1101 that:

(2) Drug abuse seriously impairs individual, as well as societal, health and well-being.

(3) Drug abuse, especially heroin addiction, substantially contributes to crime.

Appellants rely largely upon a single sentence in the circuit court's opinion in *Prudential Insurance Co. v. Saxe*, 77 U.S.App. D.C. 144, 156, 134 F.2d 16, 28, *cert. denied*, 319 U.S. 745, 63 S.Ct. 1033, 87 L.Ed. 1701 (1943), *quoted in Haubner v. Aetna Life Insurance Co.*, D.C.App., 256 A.2d 414 (1969). It states:

A misstatement to be material to the hazard assumed must be shown in some way to have affected it or contributed to the loss, and in a substantial manner. [77 U.S.App.D.C. at 156, 134 F.2d at 28, *quoted in* 256 A.2d at 416.]

This sentence, however, read in its proper context, does not support appellants' position. The court in *Saxe* went on to say: "Nor is it now more than speculative whether the answers materially affected the acceptance of the risk." *Ibid.* The *Saxe* court recognized that the acceptance of the risk (*i. e.*, the decision to issue the policy) differs from the hazard assumed (*i. e.*, the actual loss incurred). The risk involved in insuring against a possible loss is distinct from the actual occurrence of the loss. In determining whether the acceptance of the risk was affected, the focus properly must be on the basis for the issuance of the policy, not on the circumstances of the insured's subsequent death.

■ This brings us to the question of whether the misrepresentation in the reinstatement application was material to the issuance of the policy as a matter of law. Since the questions regarding narcotics use differed somewhat between the original and reinstatement applications, we will assume, but not decide, that the original policy was not in effect at the time of the insured's demise. Therefore, we need not consider whether the misrepresentation contained in the original application was material as a matter of law. We need only determine whether the reinstatement application contained a misrepresentation sufficiently material to support the issuance of a judgment n. o. v.[3]

■ "The test of materiality is whether the representation would reasonably influence the insurer's decision as to whether it should insure the applicant." *Jannenga v. Nationwide Life Insurance Co., supra,* 109 U.S.App.D.C. at 388, 288 F.2d at 172, *quoted in Metropolitan Life Insurance Co. v. Johnson,* D.C.App., 363 A.2d 984, 987 (1976). *See Haubner v. Aetna Life Insurance Co., supra,* at 416. The Deputy Medical Examiner's testimony delineating the health hazards faced by habitual heroin users amply demonstrated that the insured's narcotics addiction was material to the risk assumed by the insurer. Here, as in *Metropolitan Life Insurance Co. v. Johnson, supra,* uncontradicted testimony established that had the truth been disclosed, the application would have been rejected. Under such circumstances, the decision to deny coverage would have been "wholly reasonable." *Id.,* at 987. A misrepresentation that influences an insurer to assume a risk which it otherwise would not have underwritten inevitably is material. We conclude that the trial court correctly ruled that materiality existed as a matter of law. *See Westhoven v. New England Mutual Life Insurance Co.,* D.C.App., 384 A.2d 36 (1978); *Metropolitan Life Insurance Co. v. Johnson, supra,* at 987 n. 4; *Haubner v. Aetna Life Insurance Co., supra,* at 416; *Shafer v. John Hancock Life Insurance Co., supra,* 189 A.2d at 236–37.

### III

■ Appellants contend that in two instances irrelevant evidence erroneously was admitted at trial. First, they argue that the toxicological report on the insured's friend Judowne Thomas was not relevant and should not have been introduced. A ruling on the relevancy of evidence rests

---

**3.** Absent a statutory directive to the contrary, the same rules apply to misstatements in original and reinstatement applications. 43 Am. Jur.2d *Insurance* § 389 (1969); Annot., 148 A.L.R. 912, 917 (1944). *See Franklin Life Insurance Co. v. William J. Champion & Co.,* 350 F.2d 115, 121–24 (6th Cir. 1965), *cert. denied,* 384 U.S. 928, 86 S.Ct. 1445, 16 L.Ed.2d 531 (1966) [although that case dealt with misstatements in a reinstatement application, the court relied on cases such as *Moulor v. American Life Insurance Co.,* 111 U.S. 335, (1884), which involved original applications].

within the sound discretion of the trial court, and will not be disturbed absent a showing of an abuse of discretion. *Hardy v. United States,* 118 U.S.App.D.C. 253, 254, 335 F.2d 288, 289 (1964). We cannot say that the trial court abused its discretion in permitting the introduction of that report. It was accompanied by the Deputy Medical Examiner's testimony that:

> Many times in multiple homicides the case is an unusual case, to have more than one person killed at the time. Information has to be exchanged about the circumstances so that people can understand the case in its entirety.

One issue before the trial court was whether the misrepresentation had to be considered to be directly related to the cause of death. Prudential, even though contesting the need for such a relationship, nevertheless had the right to offer proof of its existence. While the toxicological report on Thomas may not have been highly probative on that issue, relevance requires only that the proffered evidence tend to make the existence of a fact in issue more or less probable than would have been the case without benefit of the evidence. *United States v. Carter,* 173 U.S.App.D.C. 54, 73, 522 F.2d 666, 685 (1975); *see* C. McCormick, Evidence § 185 (2d ed. E. Cleary 1972). Evidence that the insured and Thomas, who were friends, were found shot together, and that both of their bodies contained traces of narcotics, tended to make the commission of drug-related murders more probable.

■ Appellants also protest the admission of the insured's NTA records, because the first entry thereon was dated August 12, 1974, five days after the submission of the application for reinstatement. However, that first entry stated that the insured had been addicted to narcotics for two years, and therefore it was highly probative as to the truth of her statements in the reinstatement application.

Appellants further contend that the records of the insured's three hospitalizations for childbirth were inadmissible because the statements and comments contained therein were protected by the physician-patient privilege. *See* D.C.Code 1973, § 14–307.

■ The original application for an insurance policy contained the following language:

> TO ANY PHYSICIAN, HOSPITAL OR CLINIC: I hereby request and authorize you to give THE PRUDENTIAL INSURANCE COMPANY OF AMERICA any information they request about me or any member of my family with reference to past medical history or attendance or advice on hospitalization.

Similar language was present in the reinstatement application. The authorizations appeared adjacent to or directly above spaces for the applicant's signature and were in type as large as that used for most of the form's text. The signing of those authorizations necessarily negated the expectation of protected confidentiality which the privilege is intended to protect.[4] *See generally* 8 J. Wigmore, Evidence §§ 2380a, 2388 (McNaughton rev. ed. 1961). Moreover, such an authorization properly may be treated as a waiver of the privilege. *See Mutual Benefit Health & Accident Association v. McGinn,* D.C.Mun.App., 75 A.2d 643, 644 & n. 2 (1950); *New York Life Insurance Co. v. Taylor,* 79 U.S.App.D.C. 66, 69, 147 F.2d 297, 300 (1945).[5] It is not necessary that the authorization contained in the ap-

4. The case therefore lacks that element of inadvertence which made ineffective the waiver made by a beneficiary as part of reporting the death of an insured in *Ferguson v. Quaker City Life Ins. Co.,* D.C.Mun.App., 129 A.2d 189, 192 (1957).

5. There is much to be said for excluding life insurance litigation from the privilege. One commentator has stated:

> Since experience has shown that the testimony of physicians who might assist the dis-

covery of the truth is likely to be suppressed by the insured's claim of privilege, and since the contract of insurance is a voluntary transaction for both parties, the insurer's insistence on a provision of this sort in his contract is no more than a reasonable measure of self-protection, and does not affect the interest of patients in general other than the insured party to a contract. [8 Wigmore, *supra,* § 2388 at 854 (footnote omitted).]

plication refer specifically to the privilege in order to constitute a valid waiver. *See, e. g., Mutual Benefit Health & Accident Association v. McGinn, supra; Woefling v. Great-West Life Insurance Co.,* 30 Ohio App.2d 211, 285 N.E.2d 61, 69 (1972). We agree with those courts which have ruled that no distinction should be drawn between a general authorization for the release of medical information and a waiver of the physician-patient privilege. A contrary view would subject insurance companies to unreasonable risks that falsified applications would be enforced by the courts through an artificial suppression of the truth. *See Woefling v. Great-West Life Insurance Co., supra,* at 69.

Appellants further argue that the business records exception to the hearsay rule may not be stretched far enough to apply to the statements about the insured's drug use which are contained in the hospital records. They rely upon *Lyles v. United States,* 103 U.S.App.D.C. 22, 28, 254 F.2d 725, 731 (1957) (en banc), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), and *New York Life Insurance Co. v. Taylor, supra,* 79 U.S.App.D.C. at 69–70, 71–75, 147 F.2d at 300–01, 302–06, to support their position. Both cases ruled inadmissible hospital records containing expert medical opinions pertaining to psychiatric disorders. In both cases the physicians who had expressed these opinions were unavailable at trial for cross-examination.

Appellants contend that the statements admitted in this case constitute expressions of opinion based on insufficient supporting data and that they should, therefore, have been excluded. However, Dr. Reing testified that the statements in the 1972 hospital records must have been made by the insured to him. He stated that if he had merely surmised that she was using heroin the record entry would have read "suspect into heroin" instead of the more definite "Patient is a heroin addict."

Dr. Reing's testimony distinguishes the statements contained in these hospital records from those excluded in *Lyles v. United States* and *New York Life Insurance Co. v. Taylor, supra.* We are not faced here with an expression of opinion by an individual who is not available for cross-examination. Additionally, heroin usage, unlike psychiatric illnesses, *see Washington Coca-Cola Bottling Works v. Tawney,* 98 U.S.App.D.C. 151, 152, 233 F.2d 353, 354 (1956), may be documented medically through laboratory tests and physical examinations.

■ We conclude that the insured's statements properly were admitted into evidence. Appellants do not contest that the hospital records (the first level of hearsay) were business records within the meaning of the business records exception. The statements contained in the records (the second level of hearsay) then were admissible as statements concerning a presently existing bodily condition made by a patient to a physician for purposes of treatment.[6] McCormick, *supra,* § 292.

The record does not provide an adequate basis for determining the sources of the statements about the insured's drug use which appeared in the 1971 and 1973 hospital records. However, we need not order new proceedings to deal with this deficiency, because the evidence which was properly admitted leads us to affirm the trial court's ruling.

■ Appellants contend that the jury reasonably could have found that the insured had not been addicted to heroin prior to the time she filed the reinstatement application. We disagree. She applied for reinstatement on August 7, 1974, and died on October 25, 1974, two and one-half months later. The Deputy Medical Examiner testified that she had been addicted to narcotics for at least three months prior to

---

**6.** In light of the strong possibility that heroin addiction in a pregnant woman will be passed on to her child, we do not deem it significant in this case that the insured sought treatment due to her pregnancy rather than for her narcotics addiction. Similarly, virtually invariably a pregnant addict would be aware that her baby would be likely to undergo withdrawal symptoms upon birth, and it would be difficult to imagine that a woman about to give birth would fail to tell her physician of her drug usage.

her death. The NTA records indicated that she had been addicted for two years prior to the filing of the reinstatement application. The 1972 hospital records contained her own statement that she was a heroin addict. Appellants did not impeach this evidence, nor did they offer any evidence to controvert its veracity. Instead, appellants offered only the following evidence in support of their position. First, the insured had never been arrested for drug use. We do not think any reasonable person could justifiably infer from the absence of any criminal record for drug use that the insured was not a habitual drug user. Second, the insured's mother testified that she was not aware that her daughter used drugs. Third, the mother testified that she had never noticed any signs of drug addiction in the insured's babies. As we noted previously, however, the children never underwent examinations designed to determine whether they suffered any ill-effects from their mother's addiction. Thus, the only evidence upon which the jury could have relied in determining that the insured had not lied in her reinstatement application was the observations—or lack thereof—of decedent's mother, about whose knowledge of the signs of drug addiction the jury knew nothing.

The trial court correctly ruled that viewing the evidence and all reasonable inferences therefrom in the light most favorable to appellants, no juror reasonably could reach a verdict in their favor. *See McKnight v. Wire Properties, Inc.*, D.C. App., 288 A.2d 405 (1972); *District of Columbia v. Jones*, D.C.App., 265 A.2d 594 (1970); *cf. Vaughn v. Neal*, D.C.Mun.App., 60 A.2d 234 (1948) (motion for judgment n. o. v. improperly granted); *Shewmaker v. Capital Transit Co.*, 79 U.S.App.D.C. 102, 143 F.2d 142 (1944) (same).

Accordingly, the judgment notwithstanding the verdict is

*Affirmed.*